UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

   -v-                               CASE NO: 25-CR-492 (AJB)

MARVIN AGUILAR GARCIA
               Defendant.

---

# MOTION TO COMPEL DISCOVERY

DATED: January 30, 2026               Respectfully submitted,

                                   ERIC SCHILLINGER
                                   Federal Public Defender

          By:    Gabrielle DiBella, Esq.
                  Assistant Federal Public Defender
                  Bar Roll No. 700576
                  Clinton Exchange, 3rd Floor
                  4 Clinton Square
                  Syracuse, New York 13202
                  (315) 701-0080

**PRELIMINARY STATEMENT**

Marvin Aguilar Garcia is charged in a one-count indictment with assaulting a border patrol agent in violation of 18 U.S.C. §111(a)(1) and (b). Through this motion, the defense seeks an order directing the Government to disclose disciplinary records of Border Patrol agents involved in this case that are discoverable under Federal Rule of Criminal Procedure 16, because they constitute *Giglio* material, and may even constitute *Brady* material. Because the entire trial boils down to the credibility of the government's witnesses, the disclosure of impeachment material and *Brady* material is of the utmost importance. The Court may determine that a fact-finding hearing is necessary to explore the Government's diligence in obtaining that material from law enforcement.

**FACTUAL AND PROCEDURAL SUMMARY**

On December 15, 2025, Marvin Aguilar Garcia was arrested and charged with assaulting a Border Patrol agent in violation of 18 U.S.C. §111(a) and (b).  The complaint alleges that the agents were "attempting to administratively arrest the Subject" and notes that "[t]he Subject is an illegal alien with a final order of removal dated June 1, 2022."[1] Importantly, the order of removal is **not** final. Marvin did have an order of removal dated June 1, 2022. However, the pending appeal of the removal order means that the removal order is not final. Marvin filed a timely appeal which was received on June 2, 2023, and the Department of Homeland Security never filed a brief in response. As of today, the appeal is still pending. The law is clear that an order of removal cannot be executed while an appeal is pending.[2]

---

[1] Dkt. No. 1. The complaint was sworn out by an agent who was not on the scene at the time of the arrest, and has no personal knowledge of the events, HSI Special Agent Jonathan Adamowich.
[2] 8 C.F.R. §1003.6(a).

It is defense counsel's understanding that Supervisory Border Patrol Agent Kajoya Daniels now claims that Border Patrol agents had a "mistaken belief" that the appeal had concluded.[3] It is further defense counsel's understanding that this alleged "mistaken belief" was based on "the lengthy period of time that elapsed since any activity occurred on the appeal." If SBPA Daniels or other agents had been checking on the activity on the appeal, they would have seen that the appeal was still pending. Despite their recent claims to the contrary, Border Patrol **was** aware of this pending appeal, and decided to unlawfully arrest Marvin anyway.

Information about the appeal and whether it is still pending is accessible not only to Border Patrol, but also to the general public. A website exists where one can determine the status of an immigration case by entering the individual's alien number and nationality.[4] When one enters Marvin's alien number and nationality, the screen displays that an appeal is still pending.[5] It took defense counsel approximately thirty seconds to find out the information about his pending appeal. It is simply incredible to believe that multiple Border Patrol agents were unaware of this public facing website, or otherwise unaware of how to verify that an appeal was still pending.

Additionally, law enforcement agents were in fact checking on the status of the appeal. Multiple notes in the EARM database entered by law enforcement officials indicate that they were aware the appeal was still pending. On September 26, 2024, a case comment was added to the EARM system indicated that "appeal still pending as of 9/26/24." A case comment above that one from April 5, 2025, indicates that an agent was "in contact with Lewis County Probation

---

[3] *See* Government's motion in limine, Dkt. No. 20, page 4, footnote 3.
[4] This website is the Automated Case Information website for the Executive Office of Immigration Review and is publicly available at https://acis.eoir.justice.gov/en/n.
[5] A screenshot of the information found on this website for Marvin Aguilar Garcia is attached to this motion as Exhibit A. Notably, this screenshot was disclosed to defense counsel in discovery.

Office. Officer assigned verifying aliens home address/workplace." The case comments were again updated on November 9, 2025, to add a current address. After Marvin's arrest, another case comment was added to indicate he had been arrested. It would appear that every time a case comment was added, prior case comments were visible. So not only did law enforcement officials have unlimited access to the public facing website to determine that the appeal was still pending, they also had access to the case comments indicating the appeal was still pending. They had access to this information even *after* unlawfully arresting Marvin.

It is entirely *incredible* to believe that a supervisory Border Patrol Agent and other federal law enforcement agents would not have checked the status of the immigration appeal prior to arranging to arrest Marvin. Border Patrol Agent Trevor Baize started to orchestrate Marvin's unlawful arrest on December 4, 2025, if not earlier. This meant agents had at least eleven days before his arrest to either take thirty seconds to use the website to check on the status of his appeal, contact the Court to determine the status of his appeal, contact the Department of Homeland Security to determine the status of his appeal, or contact Immigration and Customs Enforcement to determine the status of his appeal.

The Government expects this Court to believe that none of that happened, and that in the eleven days that passed since BPA Baize initially reached out to Lewis County Probation Officer Matthew Morrow, not one single Border Patrol agent involved in the operation knew the appeal was still pending. The Government asks this Court to believe that a federal law enforcement agency tasked with enforcing the law would not verify that a known appeal was still pending prior to depriving an individual of their liberty during a multi-agency arrest. This was not a "mistaken belief", this was a deliberate choice to arrest an individual with a pending appeal in direct contravention of the law.

To set up the arrest, on December 4, 2025, BPA Baize reached out to Lewis County Probation Officer Matthew Morrow asking for information on when and where he "might be able to get a team to meet with Mr. Aguilar."[6] Probation Officer Morrow responded by providing an address and employment information for Mr. Aguilar Garcia, and by advising that someone from the Sheriff's Office would be willing to assist in "whatever way they were needed."[7] Probation Officer Morrow further advised BPA Baize that Marvin was going to report to the Probation office on 12/15/2025, and that if that day "does not work" for BPA Baize, then Probation Officer Morrow "could try to get it switched to a different day."[8] This appointment on 12/15/205 was not a legitimate check-in with Probation. Rather it was a way to get Marvin out of his residence and into a public place so that Border Patrol agents could arrest him. Agents did not have a warrant to enter his home, nor did they have a warrant to enter his place of employment. Thus, they needed to encounter him in public, and a Probation appointment was just the hook they needed, because they knew Marvin was required to report to Probation when asked.

The day of the set-up, Probation Officer Morrow was outside of Marvin's residence in a law enforcement vehicle. Defense counsel believes that Probation Officer Morrow would testify at trial that he did not see Marvin enter a vehicle, but that when the vehicle left the property, he was able to see a person that he believed was Marvin. It is further defense counsel's understanding that Probation Officer Morrow would testify that he could not see any distinctive hairstyle or feature that identified the defendant, but he knew it was the defendant based on prior in-person interactions.

---

[6] *See* email correspondence, attached as Exhibit B.
[7] *Id.*
[8] *Id.*

Based on Probation Officer Morrow's belief that Marvin was a passenger in the vehicle, Lewis County Sheriff's Deputy Bush then pulled the vehicle over, approximately a mile away from the residence. The location of the traffic stop was on the side of the road, right before an overpass over a frozen swamp. Law enforcement chose this location. Deputy Bush is expected to testify that he interacted with the driver of the vehicle. It is defense counsel's understanding that Deputy Bush would testify that while he was interacting with the driver of the vehicle, he saw an unmarked Border Patrol unit arrive. BPA Baize was one of the multiple Border Patrol agents who arrived at the scene, in an unmarked unit, in plain clothes. It is defense counsel's understanding that Deputy Bush did not see Marvin's hands, or any object being thrown at BPA Baize.

BPA Baize is expected to testify that Marvin threw a book at him before fleeing from the traffic stop.[9] BPA Baize only disclosed the alleged assault after BPA Bastedo asked him about a mark on his left eye.[10] Then, BPA Baize, for the first time, alleged he had been assaulted by Marvin. BPA Baize thought the item thrown was a wallet.[11] BPA Baize and BPA Bastedo attempted to look for a wallet in the area of the traffic stop. They could not locate a wallet, "**or any other** item that may have been thrown."[12] BPA Bastedo indicated that they were later informed by Probation Officer Morrow that the manual to the car that was pulled over had been "recovered from the snow-covered ground in the immediate area of the initial vehicle stop."[13] Contrary to this assertion, the manual to the vehicle had actually not been recovered.

---

[9] The indictment specifically alleges that a book was thrown.
[10] *See* Bastedo Witness Statement, attached as Exhibit C.
[11] *Id.*
[12] *Id.*
[13] *Id.*

While Probation Officer Morrow has indicated that he saw an object lying in the snow near the rear passenger side of the vehicle, and that he believed it to be a vehicle owner's manual, it is defense counsel's understanding that Morrow would testify that he did not approach the object, or pick it up. In fact, no law enforcement official picked up the object in the snow. No law enforcement official could truthfully testify that they interacted with the object, determined what the object was, or even returned the object to the vehicle.

In addition, BPA Baize is the only law enforcement official who would testify that Marvin threw this owner's manual at him. No other law enforcement official on the scene, of which there were at least nine, witnessed the alleged assault. Whether Marvin voluntary and intentionally threw an unidentified, unrecovered object at BPA Baize in the presence of multiple other law enforcement officers who did not witness this alleged assault is a question of fact for the jury. This entire trial ultimately comes down to credibility- is the Government's version of events credible? Can the Government's witnesses be believed?

Credibility of a witness can depend on many factors, including prior instances of untruthfulness, prior inconsistent statements, prior bad acts, etc. In order to effectively represent Marvin at a trial where the sole issue is credibility, defense counsel requested the disciplinary records for all Border Patrol agents involved in the case.[14] The credibility of BPA Baize is at issue, because he is the only one who will testify that he was assaulted. The credibility of all other officers is also at issue, as they claim that they were operating under a "mistaken belief" that Marvin's immigration appeal had concluded. This absolutely incredible statement calls into

---

[14] For clarity, these agents include BPA Trevor Baize, SBPA Kajoya Daniels, BPA Jhosue Escate, BPA Jacob Henderson, BPA Ross Lamore, BPA Graham Whalen, BPA Kevin Wilson, BPA-T Cole Shealey, and BPA Jordan Bastedo.

question any other statements or testimony they have made or may make related to this investigation.[15]

Through a series of emails, defense counsel corresponded with AUSA Ben Gillis in attempt to obtain information about their disciplinary records.[16] Ultimately, AUSA Ben Gillis informed defense counsel that he had sought disciplinary records but the response he received was that no impeachment or exculpatory information existed in those records.[17] AUSA Ben Gillis further declined to disclose which agency made the determination that no impeachment or exculpatory information existed in those records.[18] Defense counsel also inquired as to whether the agents had been deployed to Minnesota in the recent weeks. AUSA Ben Gillis declined to even obtain that information, stating that deployment to Minnesota would not "in and of itself, be Brady or Giglio information."[19] No further information about either the disciplinary records or recent deployments has been disclosed to defense counsel. AUSA Ben Gillis has advised that "proper procedures were followed" but declined to specify what the procedures are.[20]

**ARGUMENT**

Under Federal Rule of Criminal Procedure 16(a)(1)(E), the Government must disclose to the defendant documents and tangible objects within the possession, custody, or control of the Government that are "material to preparing the defense." The Government also has a continuing obligation to disclose to the defense all information favorable to the accused and material either to guilt or punishment.[21] By this motion, the defense seeks disclosure of the disciplinary records

---

[15] This incredible statement also calls into question statements and testimony made by others who received and acted on this information from the agents, including HSI special agent Jonathan Adamowich, who swore out the complaint.

[16] *See* DiBella Affidavit, attached as Exhibit D.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Brady v. Maryland*, 373 U.S. 83 (1963).

of the Border Patrol agents involved in the above-captioned case. These records are discoverable under Federal Rule of Criminal Procedure 16(a)(1)(E) because they (1) are within the possession, custody or control of the Government; and (2) are material to preparing the defense.

Items are within the "possession, custody, or control" of the Government when they are "in the hands of a governmental investigatory agency closely connected to the prosecutor."[22] Customs and Border Protection is a governmental investigatory agency closely connected to the prosecutor. Second, the evidence sought is material. The materiality standard under Rule 16 "is not a heavy burden."[23] "Evidence is material 'if it could be used to counter the government's case or to bolster a defense.'"[24] Evidence is also material if there is a strong indication that it will "play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal."[25] The disciplinary records of the Border Patrol agents involved in the unlawful arrest of Marvin are material to preparing the defense because they may contain impeachment information which would be critical to prepare for a trial that turns entirely on credibility.

The disciplinary records may also contain *Brady* material. Under *Brady* and its progeny, the Government is required to disclose to the defense all information "favorable to an accused" that is "material to guilt or to punishment" and that is known to the Government.[26] The *Brady* rule is grounded in the Due Process Clauses of the Fifth and Fourteenth Amendments.[27] Its purpose is to ensure that a miscarriage of justice does not arise from the suppression of evidence

---

[22] *United States v. Jordan*, 316 F.3d 1215, 1249 (11th Cir. 2003).
[23] *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993).
[24] *United States v. Ashburn*, 76 F. Supp. 3d 401, 450 (E.D.N.Y. 2014) (quoting *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993)).
[25] *Lloyd*, 992 F.2d at 351.
[26] *Brady v. Maryland*, 373 U.S. 83 (1963); *see also* Dkt. No. 8, at 1; *see also United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004).
[27] *Brady*, 373 U.S. at 87.

favorable to the accused.[28] A defendant's right to *Brady* material rests on constitutional grounds and cannot be conditioned by judicial rules requiring that a defendant show a particularized need for discovery.[29] For obvious reasons, certain disciplinary actions may constitute information that is favorable to Marvin and material to guilt or punishment.

Because the entire trial boils down to credibility, the existence of impeachment material or *Brady* material is of the utmost importance. Impeachment and exculpatory evidence is material to a finding of guilt, and the Constitution requires disclosure when there is a reasonable probability that effective use of the evidence will result in an acquittal.[30] Prosecutors must generally take a broad view of materiality and err on the side of disclosing exculpatory and impeachment evidence.[31] It is the obligation of federal prosecutors to seek all exculpatory and impeachment information from all members of the prosecution team.[32]

While AUSA Ben Gillis declined to provide specifics about the procedures used by the United States Attorney's Office to determine whether impeachment or exculpatory material exists, defense counsel located a Department of Justice policy regarding the disclosure of exculpatory and impeachment information.[33] This policy establishes "guidelines for the exercise of judgment and discretion by attorneys for the government in determining what information to disclose to a criminal defendant…" pursuant to the government's obligation to "seek justice in every case."[34] This policy directs that the disclosure requirements of the manual apply to information regardless of whether the information subject to disclosure would itself constitute

---

[28] *United States v. Bagley*, 473 U.S. 667, 675 (1985).
[29] *United States v. Gleason*, 265 F. Supp. 880, 887 (S.D.N.Y. 1967).
[30] *United States v. Bagley*, 475 U.S. 667, 676 (1985), *see also* Justice Manual, §9-5.001(B)(1) (Policy Regarding Disclosure of Exculpatory and Impeachment Information), *available at* https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings.
[31] *Kyles v. Whitley*, 514 U.S. 419, 439; *see also* Justice Manual, §9-5.001(B)(1), supra note 27.
[32] *Kyles*, 514 U.S. at 437, *see also* Justice Manual, §9-5.001(B)(2).
[33] Justice Manual, §9-5.001.
[34] Justice Manual, §9-5.001(A).

admissible evidence.[35] The policy also establishes training requirements for federal prosecutors in this area of the law.[36]

Under the DOJ policy, the Government's disclosure will exceed its obligations under the Constitution.[37] The policy encourages prosecutors to "err on the side of disclosure in close questions of materiality and identifies standards that favor greater disclosure in advance of trial through the production of exculpatory information that is inconsistent with any element of any charged crime and impeachment information that casts a substantial doubt upon either the accuracy of any evidence the government intends to rely on to prove an element of any charged crime or that might have a significant bearing on the admissibility of prosecution evidence."[38] Lastly, the policy provides that a prosecutor must obtain supervisory approval not to disclose impeachment information before trial, or not to disclose exculpatory information reasonably promptly because of its classified nature. [39]

Defense counsel has serious concerns about which agency made the determination that no impeachment or exculpatory information exists in the disciplinary records of the Border Patrol agents involved in this case. Defense counsel has not received a clear answer about which agency made this determination, and the wording of AUSA Ben Gillis' response gives defense counsel concerns that Customs and Border Protection (CBP) decided on their own what material was or was not impeachment or exculpatory. This is concerning for a number of reasons. First, because DOJ policy makes clear that federal prosecutors have the responsibility to seek all exculpatory and impeachment information, and then to err on the side of caution in disclosing the

---

[35] Justice Manual, §9-5.001(C)(3), noting that a fair trial will "often include examination of relevant exculpatory or impeachment information that is significantly probative of the issues before the court but that may not, on its own, result in an acquittal…"
[36] Justice Manual, §9-5.001(E).
[37] Justice Manual, §9-5.001(F).
[38] Justice Manual, §9-5.001(F).
[39] Justice Manual, §9-5.001(D)(4).

information. If the United States Attorney's Office has not even received or viewed the disciplinary records, then the United States Attorney's Office has wholly abandoned their responsibility under this policy. If CBP is deciding on its own that these records do not contain impeachment or exculpatory information, then the Government is being cut out of a process that is quintessential to the American system of justice that requires that impeachment and exculpatory material be provided to the defense in order to ensure a fair trial under the Constitution.

Further, and most concerning, if CBP itself decided that the records do not contain impeachment or exculpatory information, defense counsel has no reason to rely on that decision as an accurate or truthful one. CBP would not have any interest in disclosing this material to defense counsel, and would certainly have an interest in hiding the material. Most concerningly, CBP has recently made public statements that contradict the truth and obvious facts, which call into question the reliability of their assessment of impeachment and exculpatory material.[40]

With respect to the Speedy Trial Act, "[t]he time needed for the government to produce voluntary discovery . . . is not automatically excluded from the speedy trial clock."[41]

---

[40] *See e.g.,* Greg Bovino's statement on January 24, 2026, that Alex Pretti approached agents with a 9mm semi-automatic handgun, and intended to inflict "maximum damage and massacre law enforcement", video available at https://www.bing.com/videos/riverview/relatedvideo?q=video+bovino+saying+pretti+approached+agents+with+gun&mid=40BE56E853C0757AF73940BE56E853C0757AF739&FORM=VIRE ; in direct contrast to all available video footage of the incident which reflected he was holding a cell phone and recording agents, and had been disarmed before being publicly executed, video available at https://www.usatoday.com/story/graphics/2026/01/24/minneapolis-shooting-video-analysis-alex-pretti/88338183007/ (video embedded into article); *see also* Kristi Noem's statement on January 25, 2026, that Alex Pretti impeded their law enforcement operations, attacked those officers, had a weapon on him and multiple dozens of rounds of ammunition, wishing to inflict harm on these officers, brandishing a firearm, and impeding their work, video available at https://www.youtube.com/watch?v=Amhb8PK_an8 ; when all available footage of the incident reflected that he was not in fact brandishing a weapon, and instead was holding a cell phone, video available at https://www.usatoday.com/story/graphics/2026/01/24/minneapolis-shooting-video-analysis-alex-pretti/88338183007/ (video embedded into article); *see also* Kristi Noem's remarks on Renee Good that she was a "domestic terrorist" who attacked agents and "attempted to run them over and rammed them with her vehicle", video available at https://www.youtube.com/watch?v=T-UL_rEH1WQ ; when video footage shows Good attempting to drive away from the officers, video available at https://abcnews.go.com/US/video/video-shows-fatal-ice-involved-shooting-minneapolis-128997970 .

[41] *United States v. Morgan*, 493 F. Supp. 3d 171, 204 (W.D.N.Y. 2020).

Accordingly, the time it takes the Government to produce the disciplinary records should not be excluded from the speedy trial calculation. The Government should not be able to benefit from their own delay. Moreover, and for the sake of clarity, Marvin does not consent to excluding from the speedy trial clock the time needed for the Government to produce the required discovery.

### CONCLUSION

Accordingly, the defense respectfully requests that the Court order the Government to provide the defense with the disciplinary records of the Border Patrol agents involved in this case, as well as any other impeachment or exculpatory material. If the Court determines that a fact-finding hearing is necessary to explore the diligence of the United States Attorney's Office in obtaining that material, defense counsel requests that such hearing be held.

DATED: January 30, 2026                         ERIC SCHILLINGER
                                                FEDERAL PUBLIC DEFENDER

                              By:    */s/Gabrielle DiBella, Esq.*
                                     Assistant Federal Public Defender
                                     Bar Roll No. 700576
                                     Clinton Exchange, 3rd Floor
                                     4 Clinton Street
                                     Syracuse, New York   13202
                                     (315) 701-0080

To:    Ben Gillis, AUSA, by ECF
       Michael Whalen, AUSA, by ECF
       Marvin Aguilar Garcia, by mail