UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v. CASE NO.: 25-CR-492 (AJB)

MARVIN AGUILAR GARCIA

**DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION IN LIMINE REGARDING 404(B) EVIDENCE AND PRIOR BAD ACTS OF IMMIGRATION AUTHORITIES**

DATED: February 6, 2026
Syracuse, New York

ERIC SCHILLINGER
Federal Public Defender

By: _/s/Gabrielle DiBella_
Gabrielle DiBella
Assistant Federal Public Defender
Bar Roll No. 700576
Office of the Federal Public Defender
4 Clinton Square, 3rd Floor
Syracuse, New York 13202
(315) 701-0080

**A. Background**

Despite a pending immigration appeal which precluded border authorities from executing an order of removal, on December 15, 2025, Border Patrol set out to arrest Marvin Aguilar Garcia on the order of removal anyway. Border Patrol coordinated a multi-agency traffic stop including the Lewis County Probation Office and the Lewis County Sheriff's Office. The stop was planned at least eleven days in advance. Border Patrol Agent Trevor Baize alleges that as he approached the vehicle, Marvin opened the door, something hit BPA Baize in the face, and then Marvin fled. BPA Baize apparently did not see Marvin throw anything, and neither did any of the other agents on scene. Undeterred by the fact that he did not see Marvin throw anything, and he did not find any object in the snow that could have been thrown, BPA Baize alleges that Marvin threw a vehicle owner's manual at him. The Government, recognizing the obvious proof problem with this claim, tried to obtain a superseding indictment which would have alleged that Marvin threw "an object" at BPA Baize, instead of specifying a book. The Government was unsuccessful in this endeavor.

In advance of trial, the government has filed a motion in limine seeking to (1) preclude the defendant from introducing evidence or making argument related to the legality of the investigation into Marvin or the traffic stop; (2) preclude the defendant from introducing evidence or making argument related to alleged misconduct by other immigration officials; and (3) admit evidence of Marvin's alleged flight from law enforcement in a wholly unrelated case from 2020 pursuant to Federal Rule of Evidence 404(b). For the following reasons, the Government's motion *in limine* should be denied.

## B. Governing Law

### a. 18 U.S.C. §111

Marvin has been indicted on a violation of 18 U.S.C. §111(a)(1) and (b). The statute provides that whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both. The statute further provides an enhancement penalty for anyone who, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon or inflicts bodily injury. The enhancement penalty allows for a maximum term of imprisonment of 20 years.

### b. Rules 401, 403, and 404(b) of the Federal Rules of Evidence

The following rules of evidence are at issue in the Government's motion *in limine*:

> Federal Rule of Evidence 401 provides that evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.
>
> Federal Rule of Evidence 403 provides that the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.
>
> Federal Rule of Evidence 404(b) provides that (1) evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character; and (2) this evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

## C. Analysis

### a. Evidence related to the traffic Stop and USBP Investigation is relevant and goes to credibility

The Government plans to introduce evidence at trial about Marvin's entry into the United States and subsequent order of removal. In its motion *in limine*, the Government asserts that immigration authorities "first became aware of the Defendant following his conviction for misdemeanor Driving While Intoxicated in Chesterfield, Virginia."[1] Importantly, Marvin does **not** have a conviction for misdemeanor Driving While Intoxicated in Chesterfield, Virginia. Marvin does have a Virginia conviction for reckless driving.[2] The Government is correct that after that conviction Marvin had contact with immigration authorities which resulted in an order of removal. In its motion, the Government outlines a basic summary of events that unfolded in Immigration Court, but fails to highlight the main event- Marvin's petition for asylum, withholding of removal, and relief under the Convention Against Torture.[3]

In an asylum hearing, Marvin outlined that he left Guatemala because he feared for his life.[4] Specifically, because his father had been involved in the military, had hurt many people, and the children of those people wanted to hurt Marvin.[5] Marvin testified that his father was deceased, had been poisoned, and that something like that would happen to him.[6] Marvin further testified that a criminal gang wanted him to join, and when he declined to join they threatened to kill him.[7] A member of this gang had already cut one of Marvin's cousin's legs off.[8]

---

[1] Dkt No. 20, pg. 3.
[2] *See* Virginia Conviction Records, attached as Exhibit A.
[3] *See* I-589, attached as Exhibit B.
[4] *See* Asylum Transcripts, attached as Exhibit C.
[5] Exhibit C, pg. 51, lines 15-17.
[6] Exhibit C, pg. 52, lines 11-21.
[7] Exhibit C, pg. 53, lines 21-25, continued onto pg. 54, lines 1-22.
[8] Exhibit C, pg. pg. 54 lines 7-12.

Marvin testified that he didn't apply for asylum immediately upon entering the United States about ten years prior, because he was ignorant to the laws here.[9] He explained that Guatemala is full of corruption and gangs, and the gangs control the police so law enforcement would not be able to help him.[10] Marvin explained that he could not just move to a different town in Guatemala because the entire country was rampant with criminal gangs, and there would not be anyone to protect him.[11] He further testified he was scared to bring his eleven month old United States citizen son with him to Guatemala if he were removed.[12] He explained that he never reported any of the threats he received to the police because the police didn't help and he could end up dead for reporting them.[13] The Immigration Judge denied the application for asylum and withholding of removal. The Judge found Marvin to be credible and to have testified credibly.[14] The Judge found that Marvin did not establish past persecution or a well-founded fear of future persecution in Guatemala *on account of* his membership in a particular social group.[15] Marvin filed a timely appeal. The Department of Homeland Security never responded to his appeal brief. The appeal remains pending. Thus, the order of removal is not final.

The Government's first version of events of Marvin's arrest was that he was arrested pursuant to a final order of removal. This was the most credible, as this version is what appears in the complaint, in multiple police reports and narratives, and [redacted].[16] Later, the Government changed this story to include that the agents had a "mistaken belief" that the

[9] Exhibit C, pg. 54 lines 24-25, continued onto pg. 55, lines 1-5.
[10] Exhibit C, pg. 55, lines 3-5.
[11] Exhibit C, pg. 55, lines 12-20; see also pg. 56, lines 1-7.
[12] Exhibit C, pg. 55, lines 19-20.
[13] Exhibit C, pg. 61, lines 3-9.
[14] Exhibit C, pg. 70, lines 16-17.
[15] Exhibit C, pg. 70, lines 17-19.
[16] [redacted]

appeal had concluded.[17] As part of this second version of events, the Government explained that the Department of Homeland Security has "broad authority to revoke a bond or parole of an alien who has been released pending a decision on whether the alien is to be removed."[18] The Government acknowledged that regulations require DHS to make an "individualized custody determination" *before* detaining an alien.[19] The Government has admitted that that *did not happen* in this case.[20] The Government attempts to argue in its motion that this form of due process afforded to bond revocations can be reverse engineered after the fact, because "individualized circumstances existed justifying USBP revoking the Defendant's bond and returning him to custody."[21]

A third version of events has now been developed by the Government. In their trial brief, the Government now argues that Border Patrol had "conducted a review of the Defendant's immigration release status and, based in part upon the Defendant being convicted of a New York State felony in 2023, determined that the Defendant should be arrested."[22] This version stands in stark contrast to the two prior versions, and in direct contrast to the second version in which the Government admitted that the review *did not happen*.

Aware now of the illegality of arresting Marvin on the order of removal, and the incredibility of BPA agent's statements that they had a "mistaken belief" that the appeal had concluded, [redacted]

[17] Government's Motion *in Limine,* Dkt. No. 20, pg. 4.
[18] Dkt. No. 20, pg. 4.
[19] *Id.*
[20] *Id.* at n. 3: "USBP did not conduct an individualized custody determination in this case. Instead, USBP operated under the mistaken belief that the Defendant's BIA appeal had concluded and that his order of removal was final and executable. Despite this lack of an individualized determination, USBP acted appropriately because individualized circumstances existed justifying a revocation of bond."
[21] *Id.* at pg. 4.
[22] Government's Trial Brief, Dkt. No. 38, pg. 2.

[redacted][23] In an attempt to distance the agents from what was clearly an unlawful arrest, the story of the basis for Marvin's arrest has already changed multiple times, becoming more and more incredible every time. Because the story continues to change, because no one witnessed the alleged assault (not even BPA Baize),[24] because the Government cannot prove conclusively that a book was thrown at BPA Baize,[25] and because no other object was ever found,[26] the entire trial turns on the credibility of the Government's witnesses.

The Government unsurprisingly seeks to elicit testimony that the stop and arrest were lawful, while seeking to preclude Marvin from introducing evidence or argument that it wasn't. Marvin has a constitutional right to present a defense and is entitled to elicit testimony, present evidence, and make argument that the stop and arrest were anything but lawful. Because the story has changed multiple times, with each time more inconsistent than the last, the propriety of the investigation into Marvin and the traffic stop are relevant because they undermine the agents' credibility. The basis of the arrest and therefore the basis for the stop (to effectuate an unlawful arrest) are relevant because they directly relate to credibility. Credibility is always at issue in any

---

23 [redacted]

24 [redacted]

25 [redacted]

26 [redacted]

trial, but *especially* at issue in this trial where there is no evidence that Marvin assaulted BPA Baize by throwing a book, or any other object, at him.

**b. Evidence related to bad acts of other immigration authorities is also relevant, relates directly to credibility, and explains Marvin's flight from law enforcement**

The Government makes several arguments that indicate that their theory is that Marvin fled from BPA Baize *because* he had assaulted BPA Baize. There is a much more plausible explanation for why Marvin fled from BPA Baize. The more plausible explanation is because there are widespread reports throughout the country of individuals being detained by immigration authorities, sent to detention facilities both in the United States and abroad, disappearing from any tracking system, and otherwise languishing in custody without due process.[27] There are also a deeply troubling number of reports of people being detained who have do in fact have lawful status in the United States, or worse, who are in fact United States citizens.

What the federal Government did to Kilmar Abrego Garcia is a prime example of why someone might run from law enforcement despite not having committed a crime. Abrego Garcia had received an order from an Immigration Judge in 2019 granting him withholding of removal, due to the danger he would face from gang violence if he returned to El Salvador. This status

---

[27] *See, e.g., Mystery deepens: Hundreds of immigrants disappear from infamous Florida ICE prison Alligator Alcatraz*, The Economic Times (Sept. 25, 2025), *available at* https://economictimes.indiatimes.com/news/international/us/mystery-deepens-hundreds-of-immigrants-disappear-from-infamous-florida-ice-prison-alligator-alcatraz/articleshow/124128176.cms (providing details of the horrendous conditions inside the detention center and examples of people who had completely disappeared from any tracking system and who had been "accidentally deported"); *Immigrants disappear from US detainee tracking system after deportation flights,* AP News (Mar. 19, 2025), *available at* https://apnews.com/article/trump-deportations-gang-venezuela-0cf2c3a26d7f4bafa87ad6ca5a640313 (describing the deportation of a Venezuelan man whose name disappeared from the ICE online detainee locator, who had been deported to El Salvador and imprisoned in CECOT); *U.S. deports hundreds of Venezuelans to El Salvador, despite court order*, NPR News (Mar. 16, 2025), *available at* https://www.wprl.org/npr-news/2025-03-16/u-s-deports-hundreds-of-venezuelans-to-el-salvador-despite-court-order (describing the deportation of approximately 250 people to CECOT pursuant to the Alien Enemies Act after depriving them of due process and despite a court order to the contrary).

allowed him to live and work legally in the United States. He was also complying with all annual Immigration and Customs Enforcement check-ins. Despite his lawful status in the United States, Abrego Garcia was deported and sent to the notorious Salvadoran Terrorism Confinement Center (CECOT) in March 2025. The Trump administration first called his deportation "an administrative error," while later defending his deportation and accusing him of being a member of MS-13.

After he was deported, a district court in Maryland ordered the Government to "facilitate and effectuate" his return. The Government appealed, and the Supreme Court held that the Government must "facilitate" his return to the United States. The Government then interpreted "facilitate" to mean that it was not obligated to release him, and instead that it was up to El Salvador whether to release him. In June 2025, Abrego Garcia was finally returned to the United States. He was later charged with transporting aliens, and jailed in Tennessee. After he was ordered released on that case and returned to Maryland, ICE officials then warned that they would again deport him, this time to a third country. He was detained a few days later. Ultimately, he was finally released from custody on December 11, 2025.[28] The fear of being

---

[28] Abrego Garcia is one of the most outrageous examples of the unlawful detention of individuals with status in this country, but is by no means the only example. *See e.g., Multiple Legal Migrants Detained by ICE Amid Trump Blitz*, Newsweek (Jan. 31, 2025), *available at* Multiple Legal Migrants Detained by ICE Amid Trump Blitz - Newswehttps://www.propublica.org/article/immigration-dhs-american-citizens-arrested-detained-against-will?utm_source=sailthru&utm_medium=email&utm_campaign=majorinvestigations&utm_content=featureek (detailing accounts of other legal migrants detained by ICE); *We Found That More than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days,* ProPublica (Oct. 16, 2025) *available at* https://www.propublica.org/article/immigration-dhs-american-citizens-arrested-detained-against-will?utm_source=sailthru&utm_medium=email&utm_campaign=majorinvestigations&utm_content=feature (outlining review of cases where United States Citizens were detained, including one where agents knocked over and tackled a 79-year-old car wash owner and pressed their knees into his neck and back); *Venezuelan Seeking Asylum in US Must Be Released From Detention*, Bloomberg Law (July 17, 2025), *available at* https://news.bloomberglaw.com/litigation/venezuelan-seeking-asylum-in-us-must-be-released-from-detention; *Refugees relive the trauma they fled as ICE targets them in Minnesota*, NPR (Feb. 2, 2026), *available at* https://www.npr.org/2026/02/02/nx-s1-5686396/ice-arrest-refugees-legal-minneapolis-minnesota-immigration; *'ICE conveyor belt' illegally detaining, moving to Minnesota children to Texas faster than courts can respond,* MPRNEWS (Jan. 28, 2026), *available at* https://www.mprnews.org/story/2026/01/28/ice-detaining-moving-minnesota-children-to-texas-faster-than-courts-can-respond (describing, among other examples, the story of a two-

wrongfully detained, sent to a prison in another country, and fully deprived of due process would be enough of a motivation to flee from law enforcement in the absence of any criminal activity.

It is clear from recent events that the fact of having lawful status in this country, not being removable, or being a United States Citizen is not a deterrent to immigration authorities behaving in this manner. It is also apparent that the law itself is not a deterrent to immigration authorities behaving in this manner. While some of these incidents involve Immigrations and Customs Enforcement, and some involve Customs and Border Patrol, both agencies fall under the umbrella of the Department of Homeland Security, and both agencies have engaged in this type of behavior. Additionally, to expect Marvin to meaningfully parse a difference between an ICE agent and a CBP agent in a fast-developing situation in a traffic stop occurring before the sun even came up is unreasonable.

Simply put, Marvin has a constitutional right to present a defense. This includes the right to present evidence to rebut the Government's theory. The Government's theory is that he ran from law enforcement *because* he assaulted BPA Baize. Marvin has a constitutional right to present evidence that rebuts this theory, including as an alternative explanation for running from law enforcement despite not having committed a crime.

**c. Prior flight from police in 2020 is not relevant, is not 404(b) evidence, and is more prejudicial than probative**

The Government, in a very strained argument, asserts that evidence of flight from a 2020 traffic accident is "highly probative of the Defendant's state of mind, motive, and lack of accident or mistake at the time of the instant assault."[29] This argument is illogical. Flight from a

year old girl who was sent to a Texas detention facility despite a court order to return her to her home in Minnesota). The list goes on and on.

[29] To be clear, Marvin was not convicted of any fleeing, evading, or obstructing offense.

traffic accident investigation in 2020 in a different county with different law enforcement agencies has no bearing on whether the alleged assault of BPA Baize was a mistake or accident. It also has no bearing on Marvin's state of mind five years later, and provides no motive. Marvin was never accused of assaulting an officer in 2020. The officers who responded to the scene in 2020 were not from the same department as the officers involved in the instant offense. Border Patrol was not on scene for the 2020 accident. The 2020 encounter with law enforcement was legitimate and not based on an unlawful arrest. There are no similarities between these encounters.

Flight from a 2020 traffic accident is not relevant under any stretch of the imagination, as to whether five years later, Marvin voluntarily and intentionally threw a book at BPA Baize. The Government's claim that the prior flight "supports the conclusion that he assaulted BPA Baize and bolted from the Audi to evade law enforcement" is nonsensical. Flight from a traffic accident five years ago has no bearing on any fact in this case. Additionally, the facts of that case are entirely dissimilar from the instant case. After the accident, Marvin stayed at the scene while law enforcement conducted the investigation, and then at some time later fled to a horse stable. Law enforcement followed Marvin to the horse barn. Marvin told law enforcement that he stayed in the horse stable because he was cold. It was the middle of winter, after all. The Government seems to claim that Marvin fled *because* he assaulted BPA Baize. The Government apparently has not considered the idea that Marvin fled because he did not want to be the subject of an unlawful arrest, and his flight had no bearing on any alleged assault.

Even if Marvin's flight from law enforcement in 2020 were relevant, it is significantly more prejudicial than probative and must be precluded under F.R.E. 403. To hear that Marvin was convicted of a DWI and aggravated assault after a traffic accident, and that he fled to a horse

barn after the traffic accident serves only one purpose- to inflame the jury and prejudice Marvin. In the absence of any evidence to prove the alleged assault, the Government is attempting to introduce evidence of this conviction and flight as a last resort to prejudice Marvin. To quote the Government from a different argument, in their own words, "[w]hat may have occurred in other, unrelated incidents is wholly irrelevant and risks misleading the jury by focusing on collateral issues" and "wastes time through litigation of alleged acts far removed from the instant offense."[30] For the above-stated reasons, the Government's motion in limine should be denied in its entirety.

DATED: February 6, 2026
Syracuse, New York

ERIC SCHILLINGER
Federal Public Defender

By: */s/Gabrielle DiBella*
Gabrielle DiBella
Assistant Federal Public Defender
Bar Roll No. 700576
Office of the Federal Public Defender
4 Clinton Square, 3rd Floor
Syracuse, New York 13202
(315) 701-0080

[30] Dkt. No. 20, page 7.