IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No. 5:25-CR-492 (AJB) |
| | ) | |
| **v.** | ) | |
| | ) | **Filed Under Seal** |
| **MARVIN WOTSBELI** | ) | |
| **AGUILAR-GARCIA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**GOVERNMENT'S THIRD MOTION IN LIMINE**

The United States of America hereby moves *in limine* for an order precluding the Defendant, pursuant to Federal Rule of Evidence 403, from arguing, introducing evidence, or questioning regarding (1) Border Patrol Agent Trevor Baize's ("BPA Baize") membership in or posts to a Facebook group called "I'm 10-15;" (2) BPA Baize's 2023 and 2026 Facebook social media posts; and (3) Border Patrol Agent Jordan Bastedo ("BPA Bastedo") and Supervisory Border Patrol Agent Kajoya Daniels's ("SBPA Daniels") membership in "I'm 10-15."

## I. BACKGROUND

On December 15, 2025, BPA Baize was involved in an operation to arrest the Defendant. As BPA Baize approached the rear passenger side of the vehicle in which the Defendant was a passenger, the passenger door opened, the Defendant quickly exited the vehicle, and BPA Baize felt pain near his left eye consistent with having been struck by an object. The Defendant fled from the vehicle into the woods, and BPA Baize and other BPAs, including BPA Bastedo, gave chase. After the Defendant was apprehended, BPA Bastedo noticed BPA Baize had a mark near his left eye. BPA Baize and BPA Bastedo searched the area near the traffic stop but could not find an object consistent with the injury. BPA Baize's injury worsened in the hours after the traffic stop, with visible bruising forming around the eye.

On February 7, 2026, the government disclosed to the Defendant, pursuant to a protective order, information relating to BPA Baize's membership and involvement in the "I'm 10-15" Facebook group, which BPA Baize self-disclosed to the government:

a. In approximately 2018, BPA Baize joined a Border Patrol Facebook group called "I'm 10-15." BPA Baize was a member of "I'm 10-15" until the group closed down in 2019.

b. BPA Baize has self-disclosed that while he was a member of "I'm 10-15," he re-shared posts or stories created by other social media users into the "I'm 10-15" group 12 or fewer times. On these occasions, BPA Baize added commentary of his own in addition to sharing the post or story. These posts or stories, and BPA Baize's comments regarding them, related to law enforcement use of force policies and BPA Baize's interpretation of what force is appropriate. At the time of these re-posts and additional comments, BPA Baize was stationed at the U.S. Border Patrol ("USBP") less-lethal training office in El Paso, Texas, so his re-posts and comments generally related to his work at the time with USBP.

c. Additionally, while a member of "I'm 10-15," BPA Baize re-shared posts or "memes" created by other social media users into the "I'm 10-15" group perhaps 20 times, but without adding additional commentary of his own. These posts or memes generally involved pro-Border-Patrol or pro-immigration-enforcement commentary.[1] BPA Baize also offered that among the 20 posts or "memes" he re-shared without additional comment, he may have re-shared a post or "meme" that referred to migrants as "tonks,"

[1] As an example of what sort of content these posts may have consisted of, BPA Baize described a "meme" depicting a scene from an episode of the *South Park* television show in which a character becomes a BPA. The meme depicted the *South Park* character as a BPA in front of a border wall, with a caption along the lines of "get back," "not today," or similar language.

"wets," or some other derogatory term. BPA Baize stated he did not believe he had re-shared such a post or meme, but could not entirely discount the possibility that he had.

Also on February 7, 2026, the government disclosed to the Defendant information relating to BPA Baize's 2023 and 2026 social media history based on his self-disclosure:[2]

a. On December 29, 2023, BPA Baize shared a picture of a T-shirt bearing the slogan, "Wanna make everything electric? Start with the border wall".

b. On January 25, 2026, BPA Baize re-shared on BPA Baize's personal Facebook page a post created by another social media user about the Alex Pretti shooting that occurred in Minneapolis, Minnesota on January 24, 2026.[3] [redacted] responded to the post with a comment, and BPA Baize and [redacted] exchanged a series of comments back and forth. In these comments, BPA Baize opined that Alex Pretti had "fought" and "violently resisted" law enforcement while carrying a firearm, and that Pretti's own actions had caused his death.[4]

c. During January 2026, BPA Baize re-shared, without accompanying commentary of his own, three other posts that voice support for USBP, ICE, and immigration enforcement.

On February 10, 2026, the government disclosed to the Defendant, pursuant to a protective order, information relating to BPA Bastedo and SBPA Daniels's membership in "I'm 10-15:"

a. BPA Bastedo self-reported that he joined "I'm 10-15" in approximately 2016. He never posted or otherwise participated in the group. He left the group in approximately

---

[2] The social media posts in question are attached to this filing as Exhibit 1.

[3] BPA Baize's commentary to the post stated, "If you want to protest, assemble in front of the lawmakers and air your grievance. DO NOT interfere with law enforcement operations, (YES, THEY ARE LAWFUL) [*sic*]."

[4] Among other things, BPA Baize stated that, "I can agree with you that this should never have happened, but blame needs to be put where blame is due, and Alex Pretti bringing a gun to a violent confrontation with law enforcement, is exactly where blame is due."

September 2018 because he felt the tenor of the posts and comments was becoming inappropriate.

b. SBPA Daniels self-reported that he was also a member of "I'm 10-15." He does not recall whether he posted or otherwise participated in the group, but his standard practice is to not comment, post, or otherwise engage on social media and he does not believe he deviated from that standard practice on "I'm 10-15." In 2019, SBPA Daniels observed a post in "I'm 10-15" that made derogatory references about Congresswoman Alexandria Ocasio-Cortez. SBPA Daniels commented on the post, stating the post should be taken down and that the posters and participants should have been more professional. SBPA Daniels then left "I'm 10-15."

"10-15" is USBP code for "aliens in custody." The "I'm 10-15" Facebook group described itself as a group for Border Patrol Agents to post "[f]unny, serious and just work related" content. In 2019, the "I'm 10-15" Facebook group had approximately 9,500 members. Beginning in approximately July 2019, the group began receiving significant media attention due to posts made by members that consisted of jokes about sexual assault; the death of migrants; and the use of racist and misogynist memes and slurs. Media attention prompted internal and congressional investigations, and some BPAs were subject to internal discipline based on their comments and participation in the group. *See generally* "Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes," *ProPublica*, July 1, 2019.[5]

Other than the information outlined above, all of which was self-disclosed by the BPAs during the candid conversation process, the government possesses no information or materials

[5] Available online at https://www.propublica.org/article/secret-border-patrol-facebook-group-agents-joke-about-migrant-deaths-post-sexist-memes.

relating to BPA Baize, BPA Bastedo, or SBPA Daniels's membership or involvement in "I'm 10-15." The government submitted a request to Customs and Border Protection ("CBP"), requesting CBP to review the personnel files of all the government's prospective Border Patrol witnesses, including BPA Baize, BPA Bastedo, and SBPA Daniels, and provide all exculpatory and impeachment information contained therein. CBP returned a negative response to all Border Patrol witnesses, indicating it had nothing to disclose.

## II. ANALYSIS

### A. BPA Baize's Involvement with "I'm 10-15" is Inadmissible

The government anticipates that the Defendant will attempt to present argument and evidence, as well as question BPA Baize regarding his membership in and posts to "I'm 10-15." The Defendant should not be permitted to introduce evidence or present argument to that effect, because its probative value, if any, would be substantially outweighed by the danger of unfair prejudice pursuant to Federal Rule of Evidence 403.

The Sixth Amendment guarantees a defendant the right to cross-examine government witnesses, and one means of cross-examination is discrediting a witness by "revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). This right is not boundless, as district courts may impose "reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). Limits on the admission of relevant testimony are government by Federal Rule of Evidence 403, which states that evidence may be excluded if "its probative value

is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Courts have frequently held that defendants are not permitted to cross-examine witnesses on tenuous allegations of bias. In *United States v. Rahman*, the defendant argued that he should be allowed to cross-examine a government informant about the informant's alleged racial bias. *Rahman*, 189 F.3d 88, 132 (2d Cir. 1999). The alleged bias apparently related to third parties who were not "members of the defendant's racial or ethnic group." *Id.* The district court denied the request and the Second Circuit upheld the decision, citing the "very weak foundation for the allegation of racial bias." *Id.* Similarly, in *United States v. Stevenson*, the Second Circuit held that a district court did not abuse its discretion in refusing to admit evidence that a witness had used a "racial epithet" in a recorded conversation. *Stevenson*, 660 F. App'x 4, 6 (2d Cir. 2016). Because "the epithet was not used in an obviously derogatory manner," the recording was "more confusing than probative" and therefore inadmissible. *Id.*

By contrast, where a witnesses' alleged bias is well-founded, courts have permitted the evidence's admission. For example, in *United States v. Figueroa*, a government witness had two tattoos depicting swastikas. *Figueroa*, 548 F.3d 222, 227-28 (2d Cir. 2008). Citing the well-known association between swastikas and white supremacism, the Second Circuit reasoned that carrying or displaying a swastika would "tend to suggest [a witness] holds racial, religious, or ethnic prejudices" that could in turn suggest a basis for disbelieving a witness' testimony. *Id.* at 228; *see also Brinson v. Walker*, 547 F.3d 387, 396-97 (2d Cir. 2008) (New York State district judge erred by refusing to permit black defendant to elicit testimony about alleged victim's refusal to serve black patrons).

Few courts have addressed whether membership or participation in "I'm 10-15" constitutes sufficient evidence of racial animus or bias to be admissible. In *United States v. Rios-Diaz*, a district court in the Southern District of California permitted the defendant to ask a BPA witness a few questions about his membership in "I'm 10-15" and a related Facebook group at a bench trial. *Rios-Diaz*, No. 19-MJ-23711-BGS-DMS, 2021 WL 978758, at *2 (S.D. Cal. March 16, 2021) (unpublished). After the agent testified he was only aware of inappropriate posts in those groups through the media, the government made a relevancy objection, and the Court instructed defense counsel to "move on to another topic." *Id.*; *compare, e.g., United States v. Bernal-Sanchez*, No. 21-50276, 2023 WL 7179469, at *1 (9th Cir. Nov. 1, 2023) (Mem. Op.) (finding that witness' membership in "I'm 10-15" should be disclosed, but not addressing admissibility); *United States v. Tovar-Duran*, No. 19-mj-24405-BLM-GPC, 2024 WL 1444994, at *3-4 (S.D. Cal. April 3, 2024) (unpublished) (same finding).

While the actions and statements of some members of the "I'm 10-15" group clearly demonstrate racial animus, mere membership does not. The group contained 9,500 members in 2019. BPA Baize indicates that when he joined the group, about a year before the negative media attention, he remembers the group's content consisting of agents exchanging information about law enforcement trends, as well as sharing media stories that involved USBP. BPA Baize also stated he did not participate in the group during the time period that received negative media attention for posts involving racial animus. Likewise, BPA Baize's re-posts and commentary themselves do not demonstrate racial animus, as the re-posts and commentary involve pro-USBP and pro-immigration-enforcement stances, rather than negative stances towards migrants. While BPA Baize is unable to completely rule out sharing, without additional comment, a post or meme that referred to migrants using a derogatory term, he does not believe he did so. This is a far cry

from the swastika tattoos at issue in *Figueroa*. *See Figueroa*, 548 F.3d at 228. As such, any evidence the Defendant would seek to introduce in an attempt to establish such animus would be entirely speculative, and any probative value would be substantially outweighed by its prejudicial effect. *See, e.g., United States v. Bahna*, 68 F.3d 19, 23 (2d Cir. 1995) (defendant's attempt to introduce co-conspirator's statements, under theory that statements tended to exculpate defendant, properly denied under Rule 403 where defendant's interpretation of the statement was "speculative").

Another reason for exclusion under Rule 403 is the evidence's prejudicial effect. Any argument or evidence establishing that BPA Baize was a member or participant in "I'm 10-15" would necessarily require explanation about the background, significance, and fallout of the "10-15" group. *See Justice v. Hoke*, 90 F.3d 43, 48 (2d Cir. 1996) ("[E]xtrinsic proof tending to establish a reason to fabricate is never collateral and may not be excluded on that ground"). Such explanation would involve evidence or testimony about the inflammatory nature of posts within the group that received media attention—posts that BPA Baize did not make or comment on. As mentioned, "I'm 10-15" contained 9,500 members. Admission of the evidence necessary to ensure the jury understood the potential probative value of membership or participation in "I'm 10-15" would also seriously risk the jury ascribing the animus of the worst of the group's members to all of its members. Admission of the history and content of the Facebook group would also prompt a "mini-trial" on its significance and import, if any, to BPA Baize's testimony. *See United States v. Bowe*, 360 F.2d 1, 15 (2d Cir. 1966) (trial judge has discretion to exclude only slightly probative evidence if its introduction would "confuse the jury by focusing its attention on collateral issues and if it would unnecessarily delay the trial").

Based on the foregoing, the Court should preclude evidence, questioning, and argument raising BPA Baize's membership or participation in "I'm 10-15" and related social media activity.

**B. BPA Baize's 2023 and 2026 Social Media Posts are Inadmissible**

The government also anticipates that the Defendant will attempt to present argument and evidence, as well as question BPA Baize, regarding BPA Baize's social media posts from 2023 and 2026. The Defendant should not be permitted to introduce evidence or present argument to that effect, because introduction of the posts has no probative value, and if any existed, it would be substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403.

The social media posts at issue are as follows:

a. As described above, on December 29, 2023, BPA Baize shared a picture of a T-shirt bearing the slogan, "Wanna make everything electric? Start with the border wall".

b. As described above, on January 25, 2026, BPA Baize re-shared with commentary a social media post relating to the Alex Pretti shooting and engaged in a social media exchange with his cousin on that same topic.

c. On January 18, 2026, BPA Baize re-shared, without commentary, a video created by another social media user that bore the caption, "Calling enforcement slavery doesn't make it true. It just shows you don't understand either one."

d. On January 25, 2026, BPA Baize re-shared, without commentary, another user's social media post that appears to argue that individuals protesting immigration enforcement in Minnesota are "miscreants" who are "break[ing] the law, terroriz[ing] the city, and imped[ing] law-enforcement" [*sic*].

e. On or about January 27, 2026, BPA Baize re-shared, without commentary, a video created by another social media user that bore the caption, "I remember when you

> had to flash your vaccine card to eat, travel, or go to the gym. So I couldn't care less that ICE is asking for proof of citizenship. Call me heartless. I don't care."

None of these posts demonstrate racial animus on BPA Baize's part. Each post or exchange is indicative of a pro-law-enforcement and pro-immigration-enforcement mentality as opposed to an anti-migrant, ethnic, or racial mentality. The January 25, 2026, post referring to "miscreants" proffers an opinion about Minnesota protestors, not migrants or members of the Defendant's racial or ethnic class. *See, e.g., United States v. Schulte*, No. S-2 17 Cr. 548 (PAC), 2020 WL 264687, at *3 (S.D.N.Y. Jan. 17, 2020) (unpublished) (denying government's request, in unlawful disclosure of classified information trial, to introduce collateral, unrelated evidence of defendant's racial animus under Rule 403). The jury should not be called upon to debate or decide BPA Baize's views about law enforcement generally or about current events. *See* Dkt. 20, at 7-9 (government's first motion in limine, arguing that evidence and argument relating to actions of immigration authorities in other cases and nationwide should be precluded). Indeed, introduction of the social media posts invites the jury to improperly speculate about recent widely publicized actions by immigration authorities generally, distracting from the factual issues relevant to this case and inviting a mini-trial upon collateral issues. *See* Fed. R. Evid. 403; *Bowe*, 360 F.2d at 15; *United States v. Watts*, No. 10-CR-627 (KAM), 2013 WL 2020178, at *4 (E.D.N.Y. May 14, 2013) (unpublished) (marginal relevance of impeachment evidence substantially outweighed by prejudicial effect where evidence involved "unrelated and irrelevant matters" that would distract jury from trial's real issues and force jury to "engage in a trial within a trial" to evaluate evidence's import). This Court should find that BPA Baize's 2023 and 2026 social media posts are inadmissible.

### C. BPA Bastedo and SBPA Daniels's Membership in "I'm 10-15" is Inadmissible

The government anticipates that the Defendant will attempt to present argument and evidence, as well as question BPA Bastedo and SBPA Daniels, about their membership in "I'm 10-15." The Defendant should not be permitted to introduce evidence or present argument to that effect, because its probative value, if any, would be substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403.

As discussed above, mere membership in "I'm 10-15" does not demonstrate racial animus. BPA Bastedo and SBPA Daniels joined the group before it received negative media attention for posts involving racial animus. They both left the group because of posts they deemed problematic. BPA Bastedo and SBPA Daniels' temporary membership in "I'm 10-15" is not at all like the evidence of racial animus in cases where the evidence was admissible. *See Figueroa*, 548 F.3d at 228 (swastika tattoos constituted obvious basis for jury to consider witness' possible bias); *Brinson*, 547 F.3d at 396-97 (racial discrimination clear basis for jury to consider witness' possible animus against black defendant). By contrast, the evidence here is similar to cases where a district court's preclusion of possible bias evidence was upheld. *See Stevenson*, 660 F. App'x at 6 (evidence properly excluded where witness' use of "racial epithet" was not used in a manner clearly indicative of bias).

Evidence of BPA Bastedo and SBPA Daniels's membership in "I'm 10-15" is unduly prejudicial and inadmissible under Rule 403. As mentioned, any discussion of "I'm 10-15" necessarily involves a mini-trial about the group's background, significance, and fallout. Given that, if the evidence is allowed, the jury will necessarily associate BPA Bastedo and SBPA Daniels with the group, despite the fact that they wisely and appropriately left "I'm 10-15" when they became uncomfortable with the group's content. This association would tempt the jury to

inappropriately discount or disregard their testimony. *See* Fed. R. Evid. 403 (approving exclusion where evidence's probative value is substantially outweighed by "confusing the issues" or "misleading the jury").

Based on the foregoing, the Court should preclude evidence, questioning, and argument raising BPA Bastedo and SBPA Daniels's membership in "I'm 10-15."

## III. CONCLUSION

For the foregoing reasons, the Court should rule that evidence, questioning, and argument relating to (1) BPA Baize's membership or involvement in "I'm 10-15"; (2) BPA Baize's 2023 and 2026 Facebook social media posts; and (3) BPA Bastedo and SBPA Daniels's membership in "I'm 10-15" are precluded. In the alternative, the Court should forestall a mini-trial regarding "I'm 10-15" by precluding or limiting the amount of evidence and questioning permissible on that subject, and particularly by limiting questioning about BPA Baize's social media history to questions about his specific actions, specifically whether BPA Baize may have shared posts on social media containing derogatory terms referring to migrants, without reference to "I'm 10-15."

Respectfully submitted on this the 10th day of February, 2026.

/s/
TODD BLANCHE
Deputy Attorney General

JOHN A. SARCONE III
First Assistant United States Attorney

By: ______________________________
Benjamin A. Gillis, Bar Roll No. 704915
Michael J. Whalen, Bar Roll No. 704276
Assistant United States Attorneys