# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# FOR THE NORTHERN DISTRICT OF NEW YORK

Syracuse Office

4 Clinton Square
3RD FLOOR
SYRACUSE, NY 13202
(315) 701-0080
(315) 701-0081 FAX

Albany Office

54 State St.
3RD FLOOR
ALBANY, NY 12207
(518) 436-1850
(518) 436-1780 FAX

August 27, 2026

Hon. Anthony Brindisi
United States District Judge
10 Broad St.
Utica, NY 13501

**RE: United States v. Aguilar Garcia**
**Case No.: 25-CR-492 (AJB)**

Dear Judge Brindisi:

Attorney General Todd Blanche has recently characterized this Department of Justice as being "the most transparent Department of Justice in American history" and having "nothing to hide."[1] Indeed, "[t]ransparency is pivotal to public perception of the judiciary's legitimacy and independence."[2] Advance Publications, Inc., publisher of *The Post-Standard* and *Syracuse.com*, has asked this Court to unseal various filings in the above-captioned matter, seeking transparency about the dismissal of the indictment in this matter and why the taxpayers funded a prosecution that the Government could not sustain. In the spirit of transparency, and for the reasons stated in the letter request filed by Advance Publications, Inc., as well as the reasons that follow herein, defense counsel has no objection to the request to unseal, and agrees that all requested documents should be fully unsealed, with the exception of one set of redactions.

<u>Unsealing documents related to the failure of the Government to obtain a superseding indictment and the return of a no true bill</u>

Advance Publications, Inc., has requested this Court unseal documents which, unbeknownst to them, reference the Grand Jury return of a no true bill, including filings found at docket numbers 31, 48, 53, 62, 64, 72, 77, 80, 81, and 83. Defense counsel has always maintained that the return of a no true bill is a public matter, the fact of which should be made

---

[1] NBC News, *DOJ responds to House Oversight chair's push for Todd Blanche to testify* (June 12, 2026), *available at* https://www.nbcnews.com/politics/trump-administration/live-blog/trump-congress-fisa-doj-ufc-2026-primary-elections-dhs-live-updates-rcna349535.
[2] *United States v. Aref*, 533 F.3d 72, 83 (2d Cir. 2008).

publicly available.[3] Defense counsel maintains this position even though the case has been dismissed.

The Grand Jury has been described as "the voice of the community accusing its members, and the only protection from such accusation is in the conscience of that tribunal."[4] Acting as a vital check on Government power, the Grand Jury shields individuals against unwarranted prosecution. The Grand Jury clause found in the Fifth Amendment ensures oversight of the executive branch when the executive branch seeks to try a person with a crime subjecting them to imprisonment. Acting as a critical independent restraint on arbitrary and politically motivated enforcement of the criminal laws, the vital role of the Grand Jury as a check on uncontrolled government cannot be understated.

The Grand Jury operates in secret. The rule of Grand Jury secrecy is rooted in the idea that Grand Jury activities should be kept secret for five primary reasons:

1. to prevent the escape of those whose indictment may be contemplated;
2. to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors;
3. to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it;
4. to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes;
5. and to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.[5]

None of these reasons support continued sealing of the fact of a no true bill. The case has been dismissed, and Mr. Aguilar Garcia has been deported. There is no reason or even avenue for anyone to importune or tamper with the grand jurors; in addition, [redacted] Lastly, Mr. Aguilar Garcia has already suffered the stigma of public criminal charges. Continued secrecy of the fact of a no true bill serves no purpose in protecting him. None of the reasons behind Grand Jury secrecy support continued sealing of this fact.

---

[3] *See* Dkt. No. 77, pages 2-6. In further support of these arguments, other districts have made changes related to the reporting of the return of a no true bill. Most recently, the Northern District of Illinois amended its local rules to require the report of a no true bill in writing when a complaint or information is pending against a defendant. The new local rule directs the Clerk of Court to file the written form, unsealed, on the docket, with the identity of foreperson to be redacted. *See* Local Criminal Rules, N.D. Ill. 6.2.1- Report of a Grand Jury's Failure to Concur in an Indictment, *available at* https://www.ilnd.uscourts.gov/rules.php#Local_Criminal_Rules1.

[4] *In re Kittle*, 180 F.946, 947 (S.D.N.Y. 1910).

[5] *United States v. Procter & Gamble, Co.*, 356 U.S. 677, 681 n.6 (1958).

Further, as outlined in previous filings, defense counsel's position is that the return of a no true bill is not covered by Federal Rule of Criminal Procedure 6(e), and that even if it were, the fact of it can still be unsealed.[6] To add to those arguments which are incorporated herein, this Court can unseal the fact of a no true bill because of the special circumstances that exist in this case.[7] In analyzing whether special circumstances are present, district courts consider the following non-exhaustive list of nine factors:

1. The identity of the party seeking disclosure;
2. Whether the defendant to the Grand Jury proceeding or the Government opposes the disclosure;
3. Why disclosure is being sought in the particular case;
4. What specific information is being sought for disclosure;
5. How long ago the grand jury proceedings took place;
6. The current status of the principals of the Grand Jury proceedings and that of their families;
7. The extent to which the desired material- either permissibly or impermissibly- has been previously made public;
8. Whether witnesses to the Grand Jury proceedings who might be affected by disclosure are still alive; and
9. The additional need for maintaining secrecy in the particular case in question.

All factors weigh in favor of disclosure of the fact of a return of a no true bill.

<u>Identity seeking disclosure:</u> Advance Publications Inc. is a publisher of a community newspaper and website, providing news to the residents of the general area where the arrest occurred.

<u>Opposition:</u> The defendant does not oppose the disclosure. The Government has previously opposed the disclosure, though it is unknown to defense counsel whether they continue to oppose the disclosure.

<u>Purpose of disclosure:</u> Advance Publications, Inc. seeks disclosure to keep the public informed by "reporting fully, accurately, and contemporaneously on a newsworthy prosecution of paramount public concern." [8]

<u>Specific information sought:</u> Though Advance Publications Inc. doesn't know the specifics of the sealed documents, the fact of a no true bill is contained in the sealed documents.

---

[6] Dkt. No. 77, pages 2-6.
[7] *In re Petition of Craig*, 131 F. 3d 99, 103 (2d. Cir. 1997) (citing to *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959).
[8] Dkt. 85, page 2.

Timing of Grand Jury: [redacted]

Current status of principal: After having been arrested, detained, and separated from his partner and their two young children, Mr. Aguilar Garcia has been deported. Defense counsel has limited knowledge about his young family, but believes they were making arrangements to leave the United States.

Has the information previously been made public: No.

Witnesses affected by disclosure: [redacted]

Additional need for maintaining secrecy: None.

The Second Circuit has long recognized that "public interest" supports disclosure of Grand Jury materials, and that in some cases "historical or public interest alone could justify the release of grand jury information."[9] This is especially true where the dispute itself presents issues of far-reaching public importance.[10] Advance Publications, Inc. takes the position that this case was a "newsworthy prosecution of paramount public concern."[11] Defense counsel agrees with that characterization In support of their position, Advance Publications, Inc. notes a *New York Times* investigation that found that of the "more than 400 cases involving the Trump administration filing assault charges against people caught in its immigration crackdown that the investigation identified as being 'resolved so far, nearly half have unraveled: Juries acquitted defendants, judges threw out charges, or prosecutors withdrew them.'"[12] It is apparent that Mr. Aguilar Garcia's case is a part of this significant trend. In addition to a slew of acquittals and dismissals in these types of cases, there is also a trend of Grand Juries refusing to indict in similar cases. On at least six separate occasions in the District of Colombia, the Government has tried and failed to secure felony indictments.[13] These rejected indictments are in addition to

---

[9] *In re Petition of Craig*, 131 F.3d 99, 105.

[10] *See, e.g., In the Matter of Applications for Orders Directing the Review or Release of Certain Grand Jury Testimony of Mario Biaggi,* 478 F.2d 489, 494 (Suppl. Op.)(related to release of Grand Jury testimony in a public controversy involving New York City mayoral candidate and finding that "the public interest required that the request be granted with proper protection to the persons named); *In re Press Application for Access to Jud. Recs. Ancillary to Certain Grand Jury Procs. Concerning Former Vice President Mike Pence*, 678 F. Supp. 3d 135 (D.D.C. 2023) (unsealing references to Grand Jury materials, in part, because former Vice President Pence's "invocation of the Speech or Debate Clause and this Court's resolution of the ensuing controversy carry far-reaching public implications."); *In re Grand Jury Subpoenas to the Office of New York State Attorney General*, 2025 WL 3042026 (N.D.N.Y. 2025)(holding that the subpoenas concerned issues of significant public importance and that the clear public interests involved supported disclosure).

[11] Dkt. No. 85, p. 2.

[12] *Id.* at n.2.

[13] *United States v. Sydney Reid*, 25-mj-123 (MJS) (Dkt. No. 16)(A **third** Grand Jury refused to indict for an alleged assault of a federal officer); *United States v. Sean Dunn*, 25-CR-252 (CJN); (Grand Jury refused to indict based on

similar failed efforts to indict protestors in Los Angeles.[14] The failure of the Government to secure indictments in these types of cases is part of a clear trend which is significant to the public at large and constitutes a matter of public interest that justifies disclosure of the no true bill in this case.

<u>Unsealing Grand Jury transcripts</u>

[redacted]

[redacted]

[redacted]

[redacted]

---

allegations Mr. Dunn had assaulted a federal agent by throwing a sandwich at him); *United States v. Edward Dana*, 25-mj-152 (MAU) (Grand Jury refused to indict on one count of threatening the President); *United States v. Nathalie Rose Jones*, 25-mj-148 (MAU) (Grand Jury refused to indict on threatening the President).

[14] James Queally & Brittny Mejia, *Trump's top federal prosecutor in L.A. struggles to secure indictments in protest cases*, L.A. TIMES (July 23, 2025), *available at* https://www.latimes.com/california/story/2025-07-23/protester-charges-essayli.

[redacted]

<u>Unsealing documents related to *Giglio* material</u>

Advance Publications has also requested this Court unseal documents which, unbeknownst to them, reference the impeachment material of Government witnesses, including filings found at docket numbers 70 and 71. The filings reference social media activity of several Government witnesses including SBPA Baize,[15] BPA Bastedo, and SBPA Daniels, all of whom are Border Patrol agents. Border Patrol agents are public servants, whose positions are funded entirely by American taxpayers. Agents' behavior on social media which directly calls into question their biases, credibility, and ability to professionally serve the American public should be made available to the American public.

Though their participation levels varied, SBPA Baize, BPA Bastedo, and SBPA Daniels all admitted to being members of a Facebook group called "I'm 10-15." The group came to light in 2019 after it was revealed that the 9,500 Border Patrol agents who were members of it were posting horrendously offensive memes, pictures, and comments. Just the fact that these three agents were members of the group is significant. They saw the offensive posts, and decided to stay in the group.[16] SBPA Baize went even further by participating in the group. SBPA Baize's admitted participation in the group is outlined in Dkt. No. 71. The conduct detailed therein was self- reported by SBPA Baize. Since the group has been dismantled, there is no way for defense counsel to confirm that his self-reported conduct was his *only* conduct in the group. We only have SBPA Baize's word for it.

Though the "I'm 10-15" Facebook group was shut down, that has not deterred SBPA Baize from continuing to make social media posts/comments which directly evidence his bias against immigrants. He has continued to do so on his own personal Facebook page. These posts and comments are also detailed in Dkt. No. 71. One such example includes comments he made about the death of Alex Pretti, where he perpetuated objectively false information to justify Pretti's death. He also responded to comments [redacted] on the subject, reaffirming his stance that Alex Pretti was responsible for his own death. The message is clear- a person who didn't support ICE deserved to die. To be clear, there is absolutely nothing stopping [redacted] or any of his other Facebook friends, from screenshotting his post and comment history and providing it to the media or to the public. There is nothing special about SBPA Baize's social media history which entitles him to secrecy or protection. The beliefs he so strongly holds and so fiercely advocates for on his Facebook page do not now become a secret simply because he was a Government witness.

---

[15] It is defense counsel's understanding that approximately 8-10 days prior to the commencement of trial, BPA Baize was promoted to Supervisor. This promotion apparently occurred despite the knowledge of his involvement in the "I'm 10-15" Facebook group, and his incendiary posts and comments on Facebook related to the topic of immigration enforcement. The promotion appears to be consistent with the historical lack of appropriate disciplinary actions for Border Patrol agents who were involved in the "I'm 10-15" Facebook group.

[16] Although SBPA Daniels and BPA Bastedo self-reported that they left the group, their membership and eventual separation from the Facebook group highlight how significant it is that SBPA Baize stayed an active, participating member of the group.

Further, SBPA Baize's social media commentary likely also violated Custom and Border Protection's standards of conduct. The very first page of the Standards of Conduct indicates that CBP and its employees "must sustain the trust and confidence of the public they serve" and that all employees must "maintain high standards of honesty, integrity, impartiality, character, and professionalism to ensure the proper performance of government business and the continued trust and confidence of the public."[17] Further, employees are "held accountable for their actions, to include activity on social media, and are subject to appropriate disciplinary action when there is a nexus (connection) between their misconduct (on or off-duty) and the efficiency of the service."[18] SBPA Baize was not only a member of a group which frequently posted horrendously offensive photos and thoughts about immigrants, he was also an active participant in that group. His admitted participation in that group does not reflect a high standard of impartiality, character, or professionalism. Instead, it directly calls into question whether he is an individual who should be working with an immigrant population in any way.

When he no longer had a racist group to communicate with on Facebook, he continued to espouse anti-immigrant beliefs on his own personal Facebook page. Certainly, SBPA Baize is entitled to his own personal opinion about immigrants. But he crossed the line when he repeatedly posted things calling into question his impartiality and professionalism. Undoubtedly, advocating for the border wall to be made electric crosses the line from pro-immigration enforcement into anti-immigrant. Calling immigrants "wets" or "tonks" serves no legitimate law enforcement purpose. The positions he took both in this Facebook group and on his own Facebook page show a deeply held belief about immigrants that indisputably played a role in his decision to pursue an individual who was not removable under the law. In doing so, SBPA Baize mis-utilized taxpayer money and took time away from legitimate law enforcement operations by involving both the Probation department and the Sheriff's Office.

The *Giglio* material disclosed by the Government was related to social media posts and comments, and didn't consist of any information that, on its own, was confidential or otherwise privileged. It was information posted to social media, which could have been captured by any other social media user within that group, or any other user who is friends with SBPA Baize. There is nothing inherent to this material that renders it off-limits to the public or the media. Further, although the Government took the position that this material was inadmissible at trial, that does not justify continued sealing of the material. In nearly every suppression motion inadmissible evidence appears on the docket. In nearly every suppression hearing inadmissible evidence is testified to or introduced in a public hearing. Admissibility of this material at trial has no bearing on whether it should continue to be sealed.

Defense counsel understands that unsealing the *Giglio* material in this case could *potentially* have a chilling effect on law enforcement officers disclosing such behavior to the USAO in the future. However, it is important to understand that absolutely nothing is stopping law enforcement from selectively disclosing or failing to disclose such behavior right now or at any point in the future regardless of this Court's decision. Further, even if this Court doesn't

---

[17] U.S. Customs and Border Protection Standards of Conduct, §3.1, *available at* https://www.cbp.gov/sites/default/files/assets/documents/2021-Jan/cbp-standards-conduct-2020_0.pdf.
[18] *Id.* at §3.2.

unseal the *Giglio* material in this case, it doesn't ensure that any law enforcement witness is entirely truthful and forthcoming with the USAO in the future. Future compliance and truthfulness from law enforcement witnesses cannot and should not be bought with secrecy related to their misconduct, bias, prejudice, and deeply held beliefs about certain groups of people. The public cannot tolerate trading secrecy for potential future truthfulness from individuals who have been sworn to uphold the law. If the Government has concerns about law enforcement witnesses failing to be truthful with them in the future, perhaps the Government needs to have a different process for obtaining such information. The burden of addressing law enforcement's potential future lies should not fall on the shoulders of Mr. Aguilar Garcia, who has suffered enough.

Respectfully submitted,

Gabrielle DiBella
Asst. Federal Public Defender

cc: Ben Gillis, AUSA, by ECF
Michael Whalen, AUSA, by ECF