IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No. 5:25-CR-492 (AJB) |
| | ) | |
| **v.** | ) | |
| | ) | **Filed Under Seal** |
| **MARVIN WOTSBELI** | ) | |
| **AGUILAR-GARCIA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>GOVERNMENT'S RESPONSE TO PROPOSED INTERVENOR'S UNSEALING REQUEST</u>**

Dated: September 11, 2026

Respectfully submitted,

TODD BLANCHE
Attorney General

JOHN A. SARCONE III
First Assistant United States Attorney

By: ______________________
Benjamin A. Gillis
Assistant United States Attorney
Bar Roll No. 704915

# TABLE OF CONTENTS


I. INTRODUCTION ..... 3
II. BACKGROUND ..... 3
  A. The Grand Jury "No Bill" ..... 3
  B. *Giglio* Materials ..... 6
III. ARGUMENT ..... 7
  A. Proposed Intervention ..... 7
  B. Missing Docket Entries ..... 8
  C. Unsealing Requests ..... 9
    1. Relevant Law ..... 9
      a. Common-Law Right of Access ..... 10
      b. First Amendment Right of Access ..... 14
    2. The Grand Jury "No Bill" ..... 15
      a. Disclosure is Improper Under Rule 6(e) ..... 17
      b. Disclosure is Improper Under the "Special Circumstances" Doctrine ..... 18
      c. No First Amendment Right of Access Exists ..... 20
    3. The Grand Jury Transcripts ..... 22
    4. The Giglio Materials ..... 28
    5. The Government's Letter Accompanying Dismissal ..... 36
IV. CONCLUSION ..... 36

## I. INTRODUCTION

The United States of America hereby responds to proposed intervenor Advance Publications, Inc.'s (hereinafter "Advance") request that various docket entries in this case be unsealed. *See* Dkt. 85. The government does not object to Advance's standing to intervene. It also does not object to the Court posting three missing docket entries to the public docket, or to the public filing of a redacted version of the government's letter seeking leave to dismiss. However, the government objects to the unsealing of any other currently-sealed docket entries, and requests these filings be maintained under seal for the reasons set forth below.

## II. BACKGROUND

### A. The Grand Jury "No Bill"

On December 18, 2025, the Defendant, Marvin Aguilar-Garcia, was charged in a one-count indictment with a violation of 18 U.S.C. § 111(a)(1) and (b) (assaulting a federal officer). Dkt. 10. On January 29, 2026, a proposed superseding indictment was presented to the same grand jury that considered and returned the original indictment. *See* Dkt. 48, at 1. After hearing evidence and deliberating, the requisite number of grand jurors—at least 12—did not concur in the proposed superseding indictment, returning a so-called "no true bill" (hereinafter "no bill"). *Id*. The fact of the "no bill" was promptly reported to the Court. *Id*. On January 30, 2026, the government sought leave of the Court to disclose the "no bill" to the Defendant. *Id*.; *see also* Dkt. 22. On February 2, 2026, the government received that approval and promptly made the disclosure. Dkts. 23; 48, at 1. The "no bill," its admissibility, and its impact on the case, as well as grand jury transcripts arising from the December 18 and January 29 grand jury proceedings, were the subject of the following filings that Advance has requested be unsealed or unredacted:

- **Docket 31: Defendant's Letter Requesting Leave to File Redacted Trial Brief**. As an attachment to his letter, *see* Dkt. 31-1, the Defendant submitted a redacted version of his trial brief (also docketed at Dkt. 45). Dkt. 31-1, at 5-6. The redacted portion cited the fact of the "no bill" in opposition to the government's argument in its trial brief regarding proposed jury instructions. *See id.*; Dkt. 38, at 7-10.
- **Docket 48: Government's Second Motion in Limine.** In its motion, the government argued that the "no bill" was inadmissible at trial.
- **Docket 53: Defendant's Response to Government's Second Motion in Limine.** In his response to the government's second motion in limine, the Defendant argued that the "no bill" was admissible at trial. As exhibits, the Defendant provided transcripts of the grand jury testimony [redacted] (Exhibits A and C), and a transcript of the grand jury testimony [redacted] (Exhibit B).
- **Docket 62: Defendant's Response to Government's First Motion in Limine.** The Defendant submitted a redacted response to the government's first motion in limine. *See* Dkt. 62, at 2, 5-7. The redacted portions included specific references to and quotations from [redacted] grand jury testimony. *Id.* As Exhibits D and E, the Defendant provided the transcripts of [redacted] testimony, previously included as exhibits to Dkt. 53, in their entirety.
- **Docket 64: Defendant's Brief Regarding Proposed Jury Instructions.** The Defendant submitted a redacted brief addressing proposed jury instructions. *See* Dkt. 64, at 2-7. The redacted portions reference the "no bill" and included references to specific grand jury testimony. *Id.* As Exhibit A, the Defendant provided the transcript

of [redacted] testimony, previously included as exhibits in earlier filings.

- **Docket 72: The Court's Show-Cause Order.** In its Order, the Court directed the government to explain "why the original indictment remains a valid charging instrument" following the return of the "no bill."
- **Docket 77: Defendant's Brief Regarding Defendant's Arrest and "No Bill."** The Defendant submitted a redacted brief addressing, among other things, the government's position on the potential unsealing of the "no bill's" existence. *See* Dkt. 77, at 2-6. The redacted portions reference the "no bill." *Id*. As Exhibit A, the Defendant provided a redacted email from the government to the Court addressing legal issues as directed by the Court. Dkt. 77-1, at 2. The redacted portions reference the "no bill." *Id*.
- **Docket 80: Defendant's Brief Relating to Court's Show-Cause Order.** The Defendant submitted a sealed brief, relating to the Court's Dkt. 72 show-cause order, arguing that the original indictment was invalid. The brief references the "no bill" and includes embedded excerpts of [redacted] grand jury testimony. Dkt. 80, at 3-8.
- **Docket 83: Government's Letter Accompanying Dismissal Order.** Along with seeking leave of the Court to dismiss the indictment, the government submitted a letter that addressed the government's position regarding the viability of the initial indictment pursuant to the Court's Dkt. 72 show-cause order. The letter references the "no bill." Dkt. 83, at 1-2.

**B. *Giglio* Materials**

On February 7, 2026, after identifying information arguably disclosable pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), the government disclosed to the Defendant information pertaining to U.S. Border Patrol Agent Trevor Baize's ("BPA Baize") self-disclosed membership and potential participation in the "I'm 10-15" Facebook group.[1] *See* Dkt. 70, at 2-3. The government also disclosed information relating to BPA Baize's 2023 and 2026 social media history that BPA Baize had also self-disclosed. *Id*. at 3. Following an *in camera* review of additional potential *Giglio* material, the government made additional disclosures of information pertaining to U.S. Border Patrol Agents Bastedo and Daniels' ("BPA Bastedo"; "SBPA Daniels") membership in "I'm 10-15." These materials' (collectively, the "Giglio Materials") admissibility is the subject of the following filings that Advance has requested be unsealed or unredacted:

- **Docket 70: Government's Third Motion in Limine.** In its motion, the government argued that the Giglio Materials were inadmissible at trial. As an exhibit, the government provided a copy of the social media posts self-disclosed by BPA Baize that had been previously disclosed to the Defendant.
- **Docket 71: Defendant's Response to Government's Third Motion in Limine.** In his response, the Defendant opposed the government's motion and argued that the Giglio Materials were all admissible at trial.

[1] As explained in the government's previous filings, the "I'm 10-15" Facebook group received media attention in 2019 based on posted content consisting of jokes about sexual assault; the death of migrants; and use of racist and misogynist memes and slurs. *See generally* "Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes," *ProPublica*, July 1, 2019, available online at https://www.propublica.org/article/secret-border-patrol-facebook-group-agents-joke-about-migrant-deaths-post-sexist-memes.

## III. ARGUMENT

### A. Proposed Intervention

Advance, the publisher of newspaper *The Post-Standard* and its associated website, *Syracuse.com*, requests leave to intervene in order to present its motion to unseal and unredact Court records. Dkt. 85, at 3-4. The Second Circuit Court of Appeals has recognized that media organizations may intervene in criminal cases to assert the public's First Amendment right of access to the proceedings. *United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008); *United States v. Adams*, No. 24-CR-556 (DEH), 2025 WL 1226635, at *2 n.1 (S.D.N.Y. April 25, 2025) ("The press's standing to enforce the public right of access is well settled"). As such, the government has no objection to the Court designating Advance as a valid intervenor.

However, should the Court designate Advance as an intervenor, the government has concerns about Advance's access to the sealed filings prior to this Court making a final decision on the motion. While protective orders have been entered limiting the Defendant's ability to make public the "no bill's" existence, grand jury transcripts, and the Giglio Materials, those orders do not explicitly govern an intervenor's ability to do so. *See* Dkts. 23, 42, 59, 65. If Advance were to receive these materials before the final decision on unsealing has been rendered, "the very interests the government seeks to protect could be harmed before their validity could be determined." *See United States v. Carriles*, 654 F. Supp. 2d 557, 564 (W.D. Tex. 2009) (citing Fed. R. Crim. P. 16, Advisory Committee Note (while ex parte proceedings are generally "disfavored and not to be encouraged," an ex parte proceeding would be appropriate "if any adversary proceeding would defeat the purpose of the protective or modifying order"); *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 609 n.25 (1982) (complete access prior to determination of scope of right to access could defeat government's interests

"before [they] could ever be brought to bear")). Advance has no right to an unrestricted "first look" at the sealed materials "before the court has an opportunity to judge the nature of questioned documents." *Associated Press v. U.S. Dist. Court for Cent. Dist. Of California*, 705 F.2d 1143, 1149 (9th Cir. 1983) (Poole, J., concurring).

The government's decision not to object to Advance intervening should not be construed as a concession that Advance should have access to sealed materials—including as recounted in this brief—before the Court rules on its motion. It should not.

### B. Missing Docket Entries

Advance points out that three documents filed with the Court have no corresponding public docket entry. Dkt. 85, at 10-12. These documents are referred to in other public docket entries but are not themselves docketed. *See, e.g.*, Dkt. 23 (referring to "[Dkt.] 22 Ex Parte Motion (Sealed)," but no Dkt. 22 exists). The general right of public access to court proceedings requires that the public receive notice of sealed filings. *See Application of The Herald Co.*, 734 F.2d 93, 102, 102 n.7 (2d Cir. 1984) (noting that sealed filings and courtroom closure should be docketed "promptly" given the importance of "public notice" and "to afford an opportunity to challenge" sealing or closure); *United States v. Haller*, 837 F.2d 84, 87 (2d Cir. 1988) (notice of sealed filings is required, except in "extraordinary circumstances," so "the public [has] a means of learning that a closure or sealing order has been proposed or issued"). The government believes that the missing docket entries in this case were inadvertent, given that each missing entry is referenced in another public docket entry.[2] *See* Dkts. 23, 42, 60. As such, the government supports the request that Dkts. 22, 41, and 60 receive public docket entries. However, to the extent Advance requests public access

---

[2] Advance's claim that "the docketing practices here leave *Syracuse.com* without a meaningful mechanism by which to find the documents necessary to learn what has actually transpired in this Court in this case" is overstated. Dkt. 85, at 12 (quotation omitted). The missing entries, and their specific nature (sealed *ex parte* motions) are clearly described in other public docket entries. *See* Dkts. 23, 42, 60.

to the sealed *ex parte* motions that are the subject of those entries, the government objects for the reasons set forth below.

### C. Unsealing Requests

Advance requests that Dkts. 31, 48, 53, 62, 64, 70-72, 77, 80, and 83 Exhibit A be unsealed. Dkt. 85, at 3. The Defendant supports Advance's request. Dkt. 90, at 1. The government objects to Advance's request. Broadly speaking, the material that Advance seeks falls into three categories: (1) documents establishing the existence of the January 29, 2026, grand jury "no bill"; (2) grand jury transcripts and documents quoting or specifically referring to grand jury testimony; and (3) documents containing or referring to the Giglio Materials. With respect to the "no bill" and grand jury transcripts, this information and material is governed by Federal Rule of Criminal Procedure 6(e), which does not allow disclosure, and no special circumstances warranting disclosure apply. With respect to the Giglio Materials, the government can rebut a presumption of public access due to privacy concerns and the chilling effect disclosure will have on future *Giglio*-related disclosures by law enforcement to the government. Additionally, sealing of the Giglio Materials is warranted because closure is essential to preserve higher values and is narrowly tailored in this case to serve those interests.

#### 1. Relevant Law

Both a common-law right of public access to judicial documents and a First Amendment right of access to judicial documents are "firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006). Before any such right attaches, however, a court must determine whether the documents at issue are in fact "judicial documents." *Id.* at 119. Merely filing a document with the court is insufficient to render it a judicial document; rather, "the item filed must be relevant to the performance of the judicial function and useful in the

judicial process." *United States v. Amadeo*, 44 F.3d 141, 145 (2d Cir. 1995) ("*Amadeo I*"); *United States v. Bankman-Fried*, No. 22-cr-0673 (LAK), 2023 WL 1108471, at *2 (S.D.N.Y. Jan. 30, 2023) (noting that the purpose of an inquiry into whether material is a "judicial document" is "to afford a presumption of public access to materials that shed light on the manner in which judges perform their judicial duties as distinct from satisfaction of curiosity"). A document is "relevant to the performance of the judicial function" if it "would reasonably have the *tendency* to influence a district court's ruling on a motion or in the exercise of its supervisory powers, without regard to which way the court ultimately rules or whether the document ultimately in fact influences the court's decision." *Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019) (emphasis in original) (cleaned up). The material at issue in this case consists of motions and related attachments addressing the admissibility of evidence and trial procedure, specifically, jury instructions; as well as court orders and related responses addressing the viability of a charging instrument. As such, the government does not dispute that the materials Advance requests be unsealed and unredacted are "judicial documents."

**a. Common-Law Right of Access**

If a court determines that materials are judicial documents, a common-law presumption of access attaches to that material. *Lugosch*, 435 F.3d at 119. The court must then determine the weight of that presumption. *Id*. "[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *Id*. (quoting *United States v. Amadeo*, 71 F.3d 1044, 1049 (2d Cir. 1995) ("*Amadeo II*")). Documents that

directly affect an adjudication and play a significant role in determining a litigant's substantive rights receive the benefit of a strong presumption, while the public interest in other documents presents a weaker presumption. *Amadeo II*, 71 F.3d at 1049. In assessing the presumption to be applied to documents "in the middle of this continuum," courts examine whether such documents "are usually filed with the court and are generally available." *Id.* at 1050.

For example, in *United States v. Graham*, the Second Circuit held that tapes played by the government at a detention hearing, containing incriminating statements by the defendant, were entitled to a strong presumption of access because they "directly affected an adjudication," namely the court's decision to detain the defendant pending trial. *Graham*, 257 F.3d 143, 153-54 (2d Cir. 2001); *see also United States v. Adams*, No. 24-CR-556 (DEH), 2025 WL 844340, at *2 (S.D.N.Y. March 18, 2025) (strong weight of presumptive access applied to materials filed in connection with motion to dismiss). By contrast, in *United States v. Bankman-Fried*, bonds guaranteeing the defendant's pretrial release that identified specific sureties were entitled only to a weak presumption of access, primarily because the sureties' identities had played no role in the court's prior approval of the defendant's bail package. *Bankman-Fried*, 2023 WL 1108471, at *3 (noting that the public's interest in the sureties' identities was more to satisfy curiosity than to "monitor the federal courts"). Similarly, while a court's authority to "control the evidence introduced at trial surely constitutes an exercise of judicial power, we note that this authority is ancillary to the court's core role in adjudicating a case. Accordingly, the presumption of public access in filings submitted in connection with discovery disputes or motions *in limine* is generally somewhat lower than the presumption applied to material introduced at trial, or in connection with dispositive motions such as motions for dismissal." *Brown v. Maxwell*, 929 F.3d 41, 50 (2d. Cir. 2019).

As a final step in the common-law right of access analysis, after determining the weight of the presumption of access, the court must balance considerations against it. *Lugosch*, 435 F.3d at 120 (quoting *Amadeo II*, 71 F.3d at 1050). Relevant factors include but are not limited to "the danger of impairing law enforcement or judicial efficiency" and "the privacy interests of those resisting disclosure." *Id*. With respect to an asserted privacy interest, subject matters "traditionally considered private rather than public," including "family affairs, illnesses, [and] embarrassing conduct with no public ramifications" are afforded more weight. *Amadeo II*, 71 F.3d at 1050. Courts should also weigh the "nature and degree of injury" to an individual's privacy, including "the sensitivity of the information" as well as "how the person seeking access intends to use the information." *Id*. A court may also consider "whether the nature of the materials is such that there is a fair opportunity for the subject to respond to any accusations contained therein." *Id*.

Where sealing and redaction relates to grand jury material, Federal Rule of Criminal Procedure 6(e) supersedes the common-law right of access. "[F]ederal common law is subject to the paramount authority of Congress," and is only resorted to "in absence of an applicable Act of Congress." *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 313-14 (1981) (quotations omitted). "Rule 6(e) embodies a long established policy of the federal courts to maintain the secrecy of grand jury proceedings." *U.S. v. Interstate Dress Carriers, Inc.*, 280 F.2d 52, 54 (1960). The Rule is intended to protect against disclosure "of what is said or what takes place in the grand jury room. Documents as well as oral testimony of course may come within its proscription against disclosure." *Id*. No general right of access has ever been recognized with respect to grand jury records. *Application of Newsday, Inc.*, 895 F.2d 74, 79 (2d Cir. 1990); *In re Grand Jury Subpoenas Dated March 2, 2015*, No. 15-mc-71 (VEC), 2016 WL 6126392, at *3 (S.D.N.Y. Oct. 19, 2016)

("The common law does not provide a right of access to materials that must be sealed pursuant to [Rule 6(e)]").

Rule 6(e) sets forth extremely limited parameters for disclosure of grand jury material. *See* Fed. R. Crim. P. 6(e)(3). Under Rule 6(e), a party seeking grand jury materials must show that the material is "needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979). Beyond Rule 6(e)'s limitations, the Second Circuit has also recognized that disclosure of grand jury materials may be appropriate where "special circumstances" counsel against secrecy, in connection with cases concerning disclosure of "grand jury matters claimed to be of unusual historical or public interest." *United States v. Maxwell*, No. 20 Cr. 330, 2025 WL 2301281, at *7 (S.D.N.Y. Aug. 11, 2025) (citing *In re Craig*, 131 F.3d 99, 101-102 (2d Cir. 1997)). However, "courts must adhere to Rule 6(e) in 'garden variety' petitions for grand jury disclosure. The rule was intended to provide a reliable statement of the law in this area and would be rendered meaningless if departures were freely sanctioned." *Craig*, 131 F.3d at 103 (quoting *In re Hastings*, 735 F.2d 1261, 1269 (11th Cir. 1984)). The "baseline presumption" is against disclosure, and the burden is on the party seeking to overcome that presumption. *Id*. at 104 (citing *Douglas Oil*, 441 U.S. at 223).

The Second Circuit has promulgated a "non-exhaustive list of factors that a trial court might want to consider" when considering whether "special circumstances" exist:

> (i) the identity of the party seeking disclosure; (ii) whether the defendant to the grand jury proceeding or the government opposes the disclosure; (iii) why disclosure is being sought in the particular case; (iv) what specific information is being sought for disclosure; (v) how long ago the grand jury proceedings took place; (vi) the current status of the principals of the grand jury proceedings and that of their families; (vii) the extent to which the desired material—either permissibly

> or impermissibly—has been previously made public; (viii) whether witnesses to the grand jury proceedings who might be affected by disclosure are still alive; and (ix) the additional need for maintaining secrecy in the particular case in question.

*Craig*, 131 F.3d at 106. In assessing each factor, the Court emphasized that while not dispositive, "the government's position should be paid considerable heed"; that limited disclosure is favored over general disclosure; and that sustained, long-term public interest and "the passage of time" can erode many of the justifications for continued secrecy. *Id.* at 107. However, the conclusion of a grand jury investigation does not necessarily dissipate the need for secrecy. *See, e.g., In re Grand Jury Subpoenas*, 2016 WL 6126392, at *5 (argument that need for secrecy dissipated post-indictment would render grand jury secrecy "an ephemeral protection; here today and gone after conviction. That would be a radical change in the law").

**b. First Amendment Right of Access**

In addition to the common law right of access, a "qualified First Amendment right . . . to access certain judicial documents" exists. *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004). A First Amendment right of access can be established under either of two approaches: First, under the so-called "experience-and-logic approach," a right of access applies where the documents at issue "have historically been open to the press and general public" and "public access plays a significant positive role in the functioning of the particular process in question." *Id.* (quoting *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986)). Second, under an approach applicable only when analyzing judicial documents related to judicial proceedings covered by a First Amendment right, a right of access applies where the documents "are derived from or are a necessary corollary of the capacity to attend the relevant proceedings." *Newsday LLC v. County of Nassau*, 730 F.3d 156, 164 (2d Cir. 2013).

Under either approach, the right of access is presumptive and rebuttable. *Newsday*, 730 F.3d at 164. Documents may still be sealed if "specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Lugosch*, 435 F.3d at 120 (quoting *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)). Broad and general findings are not sufficient to justify sealing. *Id.* Higher values may include privacy interests; in such a scenario, the court should consider "whose privacy interests might be infringed, how they would be infringed, [and] what portions [of the records] might infringe them." *New York Times*, 828 F.2d at 116. Courts have also found that higher values warranting sealing include protecting the confidentiality of grand jury proceedings; protecting minor victims; preventing danger to persons or property; and maintaining the integrity of sensitive, ongoing law enforcement investigation. *Courthouse News Service v. Corsones*, 131 F.4th 59, 68-69 (2d Cir. 2025).

**2. The Grand Jury "No Bill"**

A threshold question associated with disclosure of the "no bill" is whether unsealing should be assessed under the common-law right of access, or within the lens of Federal Rule of Evidence 6(e)'s secrecy protections afforded "matters occurring before the grand jury." The fact that at least 12 jurors failed to concur on an indictment—a so-called "no true bill" or "no bill"—is clearly a "matter occurring before the grand jury" and therefore subject to Rule 6(e)'s secrecy protections. Fed. R. Crim. P. 6(e), (f). Although it appears that no court has so ruled explicitly, this is a common-sense proposition: a "no bill" is a direct product of grand jurors' deliberations. Rule 6 carefully describes the scenarios in which the outcome of grand juror deliberations must be disclosed, specifying that the return of an indictment must be submitted in open court before a magistrate judge; and that a "no bill" relating to a defendant against whom a "complaint or

information is pending" must be reported "promptly and in writing" to a magistrate. *Id*. at 6(f). The drafters of Rule 6 could have specified that all "no bills" must be returned or reported to the court, but chose not to. *See United States v. Jones*, No. 1:05-cr-617-WSD, 2007 WL 2071267, at *6, 6 n.9 (N.D. Ga. July 19, 2007) (Rule 6 does not require the government to disclose a "no bill" to a court or any other party, including when the "no bill" relates to a superseding indictment).

The reasoning behind Rule 6(e) also reinforces that "matters occurring before the grand jury" include "no bills." One commonly stated rationale for the need for Rule 6(e)'s protection of grand jury secrecy is to "protect [the] innocent accused who is exonerated from disclosure of the fact that he has been under investigation." *U.S. v. Procter & Gamble Co.*, 356 U.S. 677, 681 n.6 (1958) (quoting *United States v. Rose*, 215 F.2d 617, 628 (3d Cir. 1954)); *see also U.S. v. Colonial Chevrolet Corp.*, 629 F.2d 943, 949-50 (4th Cir. 1980) ("[T]he public interest and fundamental fairness to the 'innocent accused' will operate to deny disclosure where the grand jury has returned a 'no bill;' in fact, this is stated as one of the basic reasons for the rule of grand jury secrecy"). Another reason for secrecy is "to encourage all witnesses to step forward and testify freely without fear or retaliation." *Procter & Gamble*, 356 U.S. at 681-82. Finding that "no bills" are not entitled to 6(e)'s secrecy protections would undermine the government's ability to encourage witnesses to appear and testify, as it only invites increased scrutiny into the witnesses who appeared, the evidence presented, and the government's theories of the case before the grand jury, as has occurred here.[3]

[3] The need to protect the privacy of testifying witnesses and the government's theories of cases it presents to the grand jury is reinforced by the fact that the government may re-present a case to a grand jury despite a prior grand jury's refusal to return an indictment. *See United States v. Williams*, 504 U.S. 36, 49 (1992) ("The Double Jeopardy Clause of the Fifth Amendment does not bar a grand jury from returning an indictment when a prior grand jury has refused to do so").

The Defendant asserts that "matters occurring before the grand jury" do not include the results of the grand jury's deliberations. *See* Dkt. 90, at 3; Dkt. 77, at 2 (arguing that "the return of a no true bill is the *product* of a matter occurring before the Grand Jury, not a component of the Grand Jury proceedings themselves" (emphasis in original)). However, the Second Circuit has reasoned that "matters occurring before the grand jury" may include documents "closely related to the grand jury's investigation" and information that reveals the "nature and direction of the grand jury proceedings." *In re Grand Jury Subpoena*, 103 F.3d 234, 238 (2d Cir. 1996) (citing *In re Grand Jury Investigation*, 610 F.2d 202, 216-17 (5th Cir. 1980) ("matters occurring before a grand jury" include anything that may "tend to reveal what transpired before the grand jury")). The decision to return a "no bill" falls squarely within these parameters.

**a. Disclosure is Improper Under Rule 6(e)**

Because Rule 6(e) applies to the fact of the "no bill's" existence, Advance bears the burden to establish that the "no bill's" disclosure is needed, among other requirements, "to avoid a possible injustice in another judicial proceeding." *Douglas Oil Co.*, 441 U.S. at 222. The government acknowledges that when, as here, a grand jury's investigation has concluded, the need for secrecy is somewhat diminished. *See, e.g., United States v. Moten*, 582 F.2d 654, 663 (2d Cir. 1978) (suggesting a lower standard than "particularized need" should be employed after a grand jury's investigation has concluded). However, the Supreme Court has recognized that the need for secrecy remains even when a grand jury has concluded its investigation:

> [I]n considering the effects of disclosure on grand jury proceedings, the courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries. Persons called upon to testify will consider the likelihood that their testimony may one day be disclosed to outside parties. Fear of future retribution or social stigma may act as powerful deterrents to those who would come forward and aid the grand jury in the performance of its duties. Concern as to the future consequences of frank and full testimony is heightened where the witness is an employee of a company under

> investigation. Thus, the interests in grand jury secrecy, although reduced, are not eliminated merely because the grand jury has ended its activities.

*Douglas Oil Co.*, 441 U.S. at 222. In this case, Advance cannot establish a "particularized need" in connection with "another judicial proceeding," because judicial proceedings against the Defendant have concluded. Rule 6(e) offers Advance no vehicle for the "no bill's" disclosure.

**b. Disclosure is Improper Under the "Special Circumstances" Doctrine**

Advance also cannot establish that "special circumstances" exist that warrant disclosure. *See Craig*, 131 F.3d at 102-103. Bearing in mind that the "baseline presumption [is] against disclosure" and that "deciding whether to make public the ordinarily secret proceedings of a grand jury investigation is one of the broadest and most sensitive exercises of careful judgment that a trial judge can make," the factors to be considered in determining the propriety of disclosure weigh against Advance's request. *Id*. at 104, 106.

First, the "identity of the party seeking disclosure" and "why disclosure is being sought" should be considered. *Craig*, 131 F.3d at 109. Advance is a media organization that claims disclosure will permit it to "carry[] out its important responsibility of reporting fully, accurately, and contemporaneously on a newsworthy prosecution of paramount public concern." Dkt. 85, at 2. The Defendant likewise argues that this case is part of a "significant" nation-wide trend of acquittals and dismissals in cases involving allegations of assault against targets of immigration enforcement. Dkt. 90, at 4. However, despite these conclusory assertions, neither Advance nor the Defendant provide details of how the specific facts of this case are connected to any kind of broader trend or establish that the case's facts implicate "paramount public concern." Instead, both parties cite to a single news article in support of their position. Dkt. 85, at 2 n.2; Dkt. 90, at 4. But grand jury materials should not be unsealed upon "a blanket assertion that the public has an interest in the information contained in the grand jury materials." *Craig*, 131 F.3d at 105; *United States v.*

*Epstein*, 795 F. Supp. 3d 499, 507-508 (S.D.N.Y. 2025) (finding that claims of "public interest" were legally insufficient to establish special circumstances sufficient to warrant disclosure of grand jury transcripts). At most, this case implicates "garden variety" public interest, and disclosure on that basis alone would "swallow the general rule of secrecy" afforded material and information covered by Rule 6(e). *Craig*, 131 F.3d at 105.

Next, the Court should consider whether parties to the original proceeding oppose disclosure, and the additional need for maintaining secrecy in the particular case in question. *Craig*, 131 F.3d at 106. While the Defendant supports disclosure, the government opposes it, and the government's position, while not dispositive, "should be paid considerable heed." *Id.*; Dkt. 85, at 2-3. As discussed previously, the government's interest in maintaining grand jury secrecy is critical, given the destabilizing effect courts recognize can occur based on the too-casual eroding of Rule 6(e)'s secrecy protections. *See Craig*, 131 F.3d at 106 n.10 (consideration of maintaining secrecy is "fully consistent" with the Supreme Court's articulation of the importance of that principle in *Douglas Oil Co.*, 441 U.S. at 222-23).

The Court should also consider how long ago the proceedings occurred; the current status of the principals of the proceedings and their families; and whether witnesses to the proceedings who might be affected by disclosure are still alive. *Craig*, 131 F.3d at 106. The proceedings in this case related to the "no bill" are recent, occurring earlier this year. *See* Dkt. 48, at 1. As such, the passage of time has not yet proved that "the public's interest in release of the information is substantial" or that the "passage of time [has] erode[d] many of the justifications for continued secrecy." *Craig*, 131 F.3d at 107. Additionally, the Defendant [redacted] still alive, and while the fact of the "no bill" does not necessarily result in the disclosure [redacted] *See id.* (citing a

Southern District of New York case finding diminished interest in secrecy "in light of the death of the principals").

Finally, the Court should consider the extent to which the material sought has already been made public. *Craig*, 131 F.3d at 106. In granting disclosure of sealed grand jury materials under the "special circumstances" doctrine, courts have sometimes highlighted the fact that the subject matter was already public. *See id*. at 107; *In re Office of New York State Attorney General*, No. 25 Misc. 19 (LGS), 2025 WL 3042026, at *4 (N.D.N.Y. Oct. 31, 2025) (Schofield, J., sitting by designation) (granting disclosure in significant part because "the grand jury matters that would be disclosed are already public knowledge"); *compare In re Grand Jury Subpoenas*, 2016 WL 6126392, at *4 (denying disclosure in part because the grand jury material was non-public, in contrast to "[t]he few courts that have unsealed Rule 6(e) material in the past"). In this case, the "no bill's" existence is not in any way public. The non-public nature of the material sought distinguishes this case from others where disclosure was warranted.

In conclusion, each *Craig* factor is either neutral or favors continued sealing. As such, Advance cannot establish that the "special circumstances" doctrine supports the "no bill's" disclosure.

**c. No First Amendment Right of Access Exists**

This Court should also rule that continued sealing of the "no bill's" existence is warranted because no First Amendment right of access applies to such information. Courts have consistently held that no constitutional right of access applies to grand jury material and related ancillary information. *See, e.g., In re Subpoena to Testify Before Grand Jury Directed to Custodian of Records*, 864 F.2d 1159, 1562 (11th Cir. 1989) (rejecting argument that First Amendment right attached to grand jury proceedings, because such proceedings are "historically and presumptively

secret"); *Doe No. 4 v. Doe No. 1 (In re Grand Jury Subpoena)*, 103 F.3d 234, 242 (2d Cir. 1996) (no First Amendment right of access to motion papers that were so "integrally linked" to the motions at issue "as to render them inseparable"). This finding is apparent given that under the "experience-and-logic approach" to determining the existence of a First Amendment right of access, grand jury proceedings and related material have never been "historically open to the press and general public" and public access plays no "significant positive role in the functioning of the particular process in question."[4] *Hartford Courant Co.*, 380 F.3d at 91; *Doe No. 4*, 103 F.3d at 242 (First Amendment right to access is "overcome in the grand jury context by the overriding interest in secrecy") (collecting cases).

At least one court has specifically held that no First Amendment right to access attaches to the existence of "no bills." In *Globe Newspaper Co. v. Pokaski*, a media organization ("Globe") sought access to, among other things, sealed records of cases in which a state grand jury failed to indict. *Globe Newspaper Co.*, 868 F.2d 497, 500 (1st Cir. 1989). The First Circuit Court of Appeals acknowledged the general existence of a First Amendment right of access to "records submitted in connection with criminal proceedings." *Id.* at 502. However, "the First Amendment attaches only to those records connected with proceedings about which the public has a right to know." *Id.* at 509 (citing *New York Times*, 828 F.2d at 114). Because the public has no right to attend grand jury proceedings, and because the proper functioning of the grand jury system depends on the secrecy of its proceedings, Globe had no First Amendment right to access the sealed

---

[4] The Defendant asserts that the "return of a no true bill is a public matter, the fact of which should be made publicly available." Dkt. 90, at 1-2. In support, the Defendant directs the Court to the Northern District of Illinois local criminal rules, which directs that "[i]f a complaint or information is pending against a defendant and 12 jurors do not concur in the indictment, the foreperson must promptly and in writing report the lack of concurrence to the magistrate judge." *See* Local Criminal Rules, N.D. Ill. 6.2.1, available at https://www.ilnd.uscourts.gov/rules.php#Local_Criminal_Rules1. However, this rule simply restates the requirements already mandated in Fed. R. Crim. P. 6(f), and in no way expands the public's access to "no bills" generally.

"no bill" records. *Id.* Globe also argued that because there some circumstances exist where disclosure of a "no bill" is not harmful to the grand jury system, across-the-board sealing was inappropriate. *Id.* The First Circuit disagreed, reasoning that "the fact that in certain cases access to the records of 'no bill' cases may not be detrimental to the functioning of the grand jury system, and perhaps may even be beneficial to it . . . is not sufficient reason to create a *presumption* in favor of openness." *Id.* at 510 (emphasis in original).

The same reasoning applies in this case. The public has no right to attend grand jury proceedings generally, or the proceedings occurring in this case specifically. Therefore, no First Amendment right of access attaches to the "no bill's" existence, and this Court should not unseal documents that address its existence on that basis.

**3. The Grand Jury Transcripts**

Arguments against disclosure of materials covered by Rule 6(e), articulated above, are equally compelling with respect to the grand jury transcripts the Defendant attached, referenced, and quoted in his pleadings. First, no common-law right of access attaches to the transcripts, as they are clearly material governed by the secrecy protections of Rule 6(e). *See, e.g.,* Fed. R. Crim. P. 6(e)(4) ("Records . . . relating to grand-jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury"); *Application of Storer Communications, Inc.*, 828 F.2d 330, 336 (6th Cir. 1987) ("Grand jury proceedings are not conducted in the open, and transcriptions of those proceedings are subject to a rule of secrecy"); *In re Terrorist Attacks on September 11, 2001*, No. 03-MD-1570 (GBD), 2021 WL 2340411, at *2 (S.D.N.Y. June 8, 2021) (noting that records provided to the grand jury evoke "less exacting" secrecy considerations than transcripts of grand jury testimony). As with the "no bill," Advance cannot establish a "particularized need" for disclosure under Rule

6(e), because the transcripts' content is not necessary to avoid a possible injustice in another judicial proceeding, and the need for disclosure is not greater than the need for continued secrecy. *Douglas Oil Co.*, 441 U.S. at 222.

Additionally, Advance's request for public access to the transcripts is not "structured to cover only material so needed," as it cannot establish that the transcripts themselves are necessary to effectuate its stated objective to report on "the reasons behind the ultimate resolution of the case." *Id.*; Dkt. 85, at 1. The Defendant asserts that [redacted] Dkt. 90, at 5. However, the facts of the case are not secret, and have been discussed at length by the parties in public filings. *See, e.g.*, Dkt. 26, at 3-4; Dkt 38, at 1-4. Additionally, Advance has already publicized the Defendant's perspective on the facts. *See* "Assault with an owner's manual," *Syracuse.com*, May 11, 2026 (hereinafter "Syracuse.com Article").[5] There is no need for the grand jury transcripts to be disclosed [redacted] *See, e.g., United States v. Interstate Dress Carriers, Inc.*, 280 F.2d 52, 54 (2d Cir. 1960) ("The Rule is intended . . . to protect against disclosure of what is said or what takes place in the grand jury room"; distinguishing between testimony or data sought "for its intrinsic value in the furtherance of a lawful investigation" as opposed to "learn[ing] what took place before the grand jury").

Second, "special circumstances" do not justify the transcripts' disclosure. Many of the factors the Court should consider in making its "special circumstances" determination, including the identity of the party seeking disclosure; why disclosure is being sought; the parties' positions

[5] Available at https://www.syracuse.com/news/2026/05/assault-with-an-owners-manual-how-a-botched-immigration-bust-in-ny-reveals-agents-tactics.html.

on disclosure; and the timing of the requested disclosure, are identical to the factors at issue with respect to the "no bill" as discussed above, and are either neutral or weigh against disclosure. With respect to the specific information being sought for disclosure, the fact that Advance seeks the disclosure of grand jury transcripts tilts this factor in favor of continued sealing. As discussed, the transcripts [redacted] *See Craig*, 11 F.3d at 106 ("[T]here are obvious differences between releasing one witness' testimony, the full transcript, or merely the minutes of the proceeding"); *Office of New York State Attorney General*, 2025 WL 3042026, at *7 (disclosure warranted in part because "contemplated disclosures *do not* concern grand jury transcripts or other materials that might . . . reveal witness information") (emphasis added)); *United States v. Maxwell*, 794 F. Supp. 3d 215, 231 (S.D.N.Y. 2025) (request for wholesale disclosure of entire grand jury record, in contrast to "tailored disclosure," weighed against unsealing).

Next, the factors of whether witnesses to the proceedings might be affected by the disclosure, and the need for additional secrecy, counsel strongly in favor of maintaining the transcripts under seal. *Craig*, 131 F.3d at 106. [redacted]

[redacted] *Interstate Dress Carriers*, 280 F.2d at 54.

Finally, the factor relating to the extent to which the desired material has previously been made public should be considered. *Craig*, 131 F.3d at 106. [redacted] Courts have acknowledged that where the subject matter of disclosures is already public knowledge, secrecy concerns are diminished. *See, e.g., Office of New York State Attorney General*, 2025 WL 3042026, at *4. However, this fact is by no means dispositive. In *United States v. Maxwell*, the district court was presented with a motion to unseal grand jury transcripts that contained information largely duplicative of later trial testimony. *Maxwell*, 794 F. Supp. 3d at 227. The court pointed out that most cases involving requests to unseal material pursuant to the "special circumstances doctrine" involve "unique, undisclosed information" that "generally consisted of firsthand testimony from a public figure or a witness to an important event." *Id.* at 227-28 (collecting cases). "None of these

[6] The government acknowledges some courts' indication that privacy concerns are less compelling with respect to law enforcement witnesses who testify before the grand jury as opposed to civilian witnesses. *See, e.g., Dale v. Bartels*, 532 F. Supp. 973, 976 (S.D.N.Y. 1982). Nevertheless, when releasing grand jury materials, courts routinely approve redaction of law enforcement witnesses' identities to preserve privacy. *See, e.g., Adams*, 2025 WL 1226635, at *2 ("[T]argeted redactions can protect the identities of government agents"); *In re Search Warrant*, No. 16-mc-00464 (PKC), 2016 WL 7339113, at *4 (S.D.N.Y. Dec. 19, 2016) (approving redactions of identities of law enforcement agents involved in investigation described in unsealed materials).

cases involved the secondhand, summary-witness testimony of law enforcement agents." *Id.* at 228. The court held that the already-public content of the sought materials undercut the basis for which the materials were sought, and did not justify unsealing in light of other concerns such as privacy and the systemic interest in grand jury secrecy. *Id.* at 228-31.

The same concerns apply in this case. Advance's stated rationale for unsealing is to reveal "the reasons behind the ultimate resolution of the case." Dkt. 85, at 1. [redacted] *See* Syracuse.com Article (stating that government witnesses could not testify they saw, photographed, or collected a book from the scene). As such, Advance has failed to connect the public interest with the materials it actually seeks to unseal, "which would not answer any of the public's questions." *Maxwell*, 794 F. Supp. 3d at 230-31. Based on the foregoing, Advance cannot establish "special circumstances" that warrant the grand jury transcripts' disclosure.

Advance also appears to assert that a proffer "giving rise to a strong inference of misconduct" somehow justifies the disclosure of grand jury materials. Dkt. 85, at 10. In support, it cites *In Matter of Grand Jury Minutes in U.S. v. Tam*, No. 96 CV 2810, 1997 WL 21369 (E.D.N.Y. Jan. 9, 1997). That case supports no such justification. In *Tam*, the government conducted a wire fraud and money laundering investigation and obtained indictments against multiple defendants. *Tam*, 1997 WL 21369, at *1. After reviewing the evidence, "the Assistant U.S. Attorney preparing the case for trial determined that there was insufficient evidence on which a jury could conclude beyond a reasonable doubt" that the defendants were guilty and moved to

dismiss the indictment. *Id.* After dismissal, the defendants requested the disclosure of the grand jury minutes related to his indictment. *Id.* at *2. The petitioners asserted that disclosure was necessary to establish "that the indictment was procured through governmental misconduct before the grand jury and they hope to find such misconduct by reviewing the grand jury minutes." *Id.* The Court rejected disclosure, finding that the petitioners' request was "based solely on conjecture and courts have consistently refused to grant disclosure based on a requesting party's speculation as to what occurred before the grand jury." *Id.* at *4. This case is directly analogous, in that Advance's only basis for a claim of misconduct is that the government "voluntary[ily] withdr[ew] charges" against the Defendant. Dkt. 85, at 10. A claim of misconduct based on such flimsy conjecture cannot support "particularized need" under Rule 6(e) or "special circumstances" under Second Circuit precedent to justify disclosure of the grand jury transcripts.

Neither can Advance establish a First Amendment right to access the grand jury transcripts. The public has no right of access to grand jury proceedings or testimony. *See Doe No. 4*, 103 F.3d at 242; *Application of Newsday*, 895 F.2d at 79 (no general right of access has "ever been recognized" for grand jury records). Courts have held that even ancillary proceedings, such as contempt proceedings for grand jury witnesses, that tend to disclose questions posed by the grand jury are inaccessible to the public and therefore no First Amendment right attaches. *See United States v. Index Newspapers LLC*, 766 F.3d 1072, 1089-90 (9th Cir. 2014) (noting that such proceedings with "usually require at least some disclosure of grand jury questions" and that there is "no right to have the general public present while the grand jury's questions are being read") (quoting *Levine v. United States*, 362 U.S. 610, 618 (1960)); *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 499-500 (D.C. Cir. 1998). The material at issue in this case falls comfortably within this category, given that the filings Advance seeks to unseal attach grand jury transcripts and quote

from those transcripts, [redacted]. Furthermore, even if a First Amendment right to access the transcripts existed—and it does not—"higher values" such as the preservation of grand jury secrecy and the privacy of witnesses preclude disclosure.

Based on the foregoing, the Court should not unseal the grand jury transcripts.

**4. The Giglio Materials**

The Giglio Materials are described in the government's motion in limine and associated exhibit, as well as the Defendant's response. Dkts. 70, 71. Because these documents call upon the Court to decide questions of admissibility, they are judicial documents to which a presumptive common-law right of access attaches. *Lugosch*, 435 F.3d at 119. Courts have also held that such filings bear a qualified First Amendment right of access under the "experience-and-logic" approach. *See United States v. Silver*, No. 2016 WL 1572993, at *4 (S.D.N.Y. April 14, 2016) (finding that motion in limine practice has "historically been open to the press and general public," and that public access to such litigation "plays a significant positive role in the functioning of evidentiary decision-making") (quotations omitted)); *but see Matter of Public Defender Service for District of Columbia to Unseal Certain Records*, 607 F. Supp. 3d 11, 21-22, 23-24 (D.D.C. 2022) (distinguishing motions *in limine* and exhibits attached to those motions, and ultimately finding no First Amendment right of access to such exhibits).

With respect to the common-law right of access, the Court must determine the weight to be given the presumption of access and the government, as the party requesting sealing, has the opportunity to establish "compelling interests" that justify sealing despite the presumption. *Amadeo II*, 71 F.3d at 1049; *Lugosch*, 435 F.3d at 120. The Court should assign a low weight to the presumption of access attaching to the Giglio Materials. Courts have held that while evidence

introduced at trial enjoys a strong presumption of public access, documents that do not play a direct role in a court's Article III duties are afforded only a low presumption that "amounts to little more than a prediction of public access absent a countervailing reason." *Amadeo II*, 71 F.3d at 1049-50. In *Brown v. Maxwell*, a district court was asked to unseal, among other things, motions to exclude specific testimony. *Brown*, 929 F.3d at 50. The Second Circuit noted "such motions, on their face, call upon the court to exercise its Article III powers." *Id.* However, "a court's authority to oversee discovery and control the evidence introduced at trial . . . is ancillary to the court's core role in adjudicating a case." *Id.* Therefore, "the presumption of public access in filings submitted in connection with . . . motions *in limine* is generally somewhat lower than the presumption applied to material introduced at trial, or in connection with dispositive motions such as motions for dismissal." *Id.*

A low presumptive right of access in this case is also consistent with the principle that the weight of the presumption is weaker "where filing with the court is unusual or generally under seal." *Graham*, 257 F.3d at 151 (quoting *Amadeo II*, 71 F.3d at 1050). Information that may constitute disclosable material under *Giglio v. United States* is often provided by the government to defendants pursuant to a court-approved protective order, and court filings that address such material is commonly filed under seal. *See, e.g., United States v. Chang*, No. 18-CR-00681 (NGG) (CLP), 2024 WL 4766371, at *2 (E.D.N.Y. Nov. 13, 2024) (noting *Giglio*-related motions were filed under seal); *United States v. Bracy*, No. 20-CR-483 (ARR), 2022 WL 17801133, at *1 (E.D.N.Y. Dec. 19, 2022) (noting motions in limine related to *Giglio* material were filed under seal); *United States v. Tafoya*, No. CR 07-697 MCA, 2007 WL 9717923, at *16 (D.N. Mex. Oct. 18, 2007) (same). Motions dealing with *Giglio*-related material almost always involve sensitive,

often non-public information that raises privacy concerns for the prospective witnesses involved. Given these realities, affording a low weight to the presumption of access is appropriate.

Regardless of the presumption's strength, the Giglio Materials should remain under seal because other factors outweigh the presumption of public access. First, with respect to BPA Bastedo and SBPA Daniels' membership in the "I'm 10-15" Facebook page, a right of privacy attaches. "In determining the weight to be accorded an assertion of a right of privacy, courts should first consider the degree to which the subject matter is considered private rather than public. . . . [E]mbarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public." *Amodeo II*, 71 F.3d at 1051. BPA Bastedo and SBPA Daniels' membership in the group occurred years ago, and both left the group when they observed posts that made them uncomfortable. Dkt. 70, at 3-4. Years-old discontinued membership in a specific social media group is not information generally considered public, and there is no allegation that BPA Bastedo or SBPA Daniels engaged in any kind of inappropriate activity while members of "I'm 10-15." Indeed, the best argument the Defendant musters for this category of information's disclosure is that it "highlights" the alleged significance of BPA Baize's conduct. *See* Dkt. 90, at 6 n.15. Past membership in "I'm 10-15" is undoubtedly embarrassing, given the group's notoriety, but given the limited scope of these agents' engagement with the group, their conduct has no public ramifications whatsoever. This Court should find that, with respect to all the Giglio Materials discussing BPA Bastedo and SBPA Daniels, any presumptive right of access has been rebutted and those portions of the Giglio Materials should remain sealed. *See, e.g., Di Pietro v. United States*, No. 02 Cr. 1237-01(SWK), 2009 WL 801609, at *3 (S.D.N.Y. March 24, 2009) (finding ex parte letter regarding potential *Giglio* material had

weak presumption of access, constituted "embarrassing conduct with no public ramifications," and therefore should remain sealed).

A right of privacy also attaches with respect to at least some of the Giglio Materials involving BPA Baize. Much of the material at issue is comprised of self-disclosed, non-public historical social media posts expressing support for law-enforcement and immigration-enforcement related topics. Dkt. 70, at 3. Other material involves a conversation between BPA Baize and [redacted] regarding immigration enforcement and appropriate use of force. *Id.* While the subject matter of these posts aligns with current public discourse, it is not surprising that a law enforcement officer and immigration agent would express pro-law-enforcement or pro-immigration-enforcement views. Additionally, these posts are not currently public, as evidenced by the fact that Advance did not include any of them in its publications about the case. *See* Syracuse.com Article (including one social media post purportedly made by BPA Baize from 2015, which is not part of the Giglio Materials). As such, this material is more akin to the information about "family affairs" and "embarrassing conduct with no public ramifications" that should be afforded a greater privacy right. *See Amadeo II*, 71 F.3d at 1051. The Defendant requests a blanket disclosure of all the Giglio Materials, but in fact, careful parsing of the privacy interests involved with each piece of disclosed information is warranted. After all, the privacy interests of third parties "should weigh heavily in a court's balancing equation." *Application of Newsday*, 895 F.2d at 79-80; *see also United States v. Rodriguez*, No. 2006 WL 8438032, at *1 (D.N.D. Nov. 27, 2006) (denying defendant's post-conviction motion to unseal pleadings discussing *Giglio* material relating to a witness who never testified at trial; "[a]s the information contained within these sealed pleadings never became relevant, this Court finds little justification for releasing information that would harm [the witness'] privacy interests").

The government acknowledges that BPA Baize's membership and participation in "I'm 10-15" and social media posts that allegedly reveal BPA Baize's views on immigrants as a group, rather than immigration enforcement, more closely align with "conduct affecting a substantial portion of the public." *Amodeo II*, 71 F.3d at 1051. However, safety concerns, as well as the chilling effect disclosure may have upon the government's future efforts to obtain *Giglio* material, warrant caution, and ultimately justify the continued sealing of all the Giglio Materials pertaining to BPA Baize.

Because unsealing the Giglio Materials is sure to result in additional media coverage, resulting in broad dissemination of the materials' subject matter, this Court must consider the safety concerns unsealing presents to all three BPAs discussed therein. Other courts have recently acknowledged the safety risks facing federal agents whose identities are highlighted in the media or by private actors. In *United States v. Virginia*, a district court identified in its findings of fact increasing instances of doxxing, targeted threats, and retaliation against federal immigration officers. *Virginia*, -- F. Supp. 3d --, 2026 WL 2411521, at *4 (E.D. Va. Aug. 18, 2026). The Court stated that "the rise of doxxing, the advancement of facial recognition technologies, and the proliferation of bad actors on social media, has created an unprecedented risk for federal law enforcement officers." *Id*. at *6 (quoting a declaration from Justin Hargis, Executive Director of the U.S. Dept. of Homeland Security ("DHS"), Customs and Border Protection ("CBP"), Investigative Operations Directorate). The Court credited the statements of several senior law enforcement officials from three different federal agencies. *See id*. at *4-6. Collectively, these officials described "increasingly common threats of targeted harassment of and retaliation against federal immigration officers"; as well as documented incidents of "doxxing," or the unauthorized

public disclosure of agents' personal identifying information.[7] *Id*. (quotation omitted). The Court also noted that increased scrutiny on agents' specific identities harms law enforcement operations by rendering agents more visible when conducting surveillance or undercover operations. *Id*. at *5. Similarly, in *United States v. Philadelphia*, the Court found the government had established concrete examples of harm that had "materialized from public identification of its officers," including specific instances of doxxing and threats. *Philadelphia*, -- F. Supp. 3d --, 2026 WL 1906075, at *13 (E.D. Pa. July 2, 2026) (identifying harms stemming from local ordinance mandating, among other things, the public identification of federal agents, including "assault, intimidation, and harassment of federal employees and their family members"; obstruction and interference with the "ability to apprehend individuals who pose significant risks to national security and public safety"; and "chilling officers and thus federal operations" (cleaned up)).

BPA Baize has already been identified publicly as the assault charge's complainant. *See, e.g.,* Dkt. 45, at 2; Syracuse.com Article. However, that fact should not deter the Court from protecting what has not already been made public: BPA Baize's self-reported "I'm 10-15" involvement and social media history, none of which has ever been deemed admissible by a court. Similarly, BPA Bastedo and SBPA Daniels' past "I'm 10-15" membership is currently non-public.

---

[7] *See also* U.S. Dept. of Homeland Security ("DHS") Press Release, "Bounties Originating From Mexico Offered to Shoot ICE and CBP Officers in Chicago," Oct. 14, 2025, available at https://www.dhs.gov/news/2025/10/14/bounties-originating-mexico-offered-shoot-ice-and-cbp-officers-chicago; DHS Press Release, "ICE Officers Face an 8,000% Increase in Death Threats Against Them and Their Families," Jan. 26, 2026, available at https://www.dhs.gov/news/2026/01/26/ice-officers-face-8000-increase-death-threats-against-them-and-their-families (also citing a "1,300% increase in assaults" against immigration agents); U.S. Immigration and Customs Enforcement ("ICE") Press Release, "California man accused of doxxing ICE employee now in custody," Sept. 26, 2025, available at https://www.ice.gov/news/releases/california-man-accused-doxxing-ice-employee-now-custody; "Federal indictment charges 3 activists with alleged 'doxing' of ICE agent in Los Angeles," *Associated Press*, Sept. 29, 2025, available at https://apnews.com/article/ice-agent-doxing-indictment-california-544db71360804ce0236866b30f22651e.

Public association of these BPAs with "I'm 10-15" and the other conduct at issue in the Giglio Materials will invite the very sort of harassment, targeting, and safety concerns highlighted above.

The Court should also consider the effect disclosure may have upon judicial efficiency. "The judicial system derives substantial benefit from in camera review of potential *Giglio* material." *Di Pietro*, 2009 WL 801609, at *3. The same can be said of the process by which the government obtained and disclosed the Giglio Materials in this case. Prospective law enforcement witnesses were all interviewed, and many self-disclosed information that otherwise would not have been available to the Defendant that was subsequently affirmatively provided to the Defendant, or provided to the Court for *in camera* consideration. Because of the sensitive, embarrassing nature of some of the disclosures, the government sought and obtained a protective order to govern the Giglio Materials and their use, which as explained above is a commonly accepted practice. Following disclosure, the parties litigated the materials' admissibility, with the Court never ruling on that issue.

The government understands that *Giglio* information deemed admissible in court no longer enjoys substantial privacy protections, but the same cannot be said for material that, at least in the government's perspective, was inadmissible at trial. *See generally* Dkt. 70 (government's third motion in limine, arguing that the Giglio Materials were inadmissible). If law enforcement agents learn that a court granted full public access to *Giglio* information under these circumstances, it will have a substantial chilling effect on the government's ability to obtain similar information in the future. *See Storer Communications*, 828 F.2d at 337 (Joiner, S.D.J., concurring) (noting that court assessment of potential *Brady* material "should be encouraged," but that general public access to this procedure will "hamper" the likelihood of prosecutors continuing to seek court review).

The Defendant discounts the likelihood of any chilling effect by asserting that law enforcement is already selectively disclosing *Giglio* information. *See* Dkt. 90, at 7-8. However, what occurred in this case points to the contrary: that DOJ's process of obtaining *Giglio* information effectively ensured that all information that could potentially qualify as *Giglio* was brought to the attention of the parties and the Court.[8] *See* Dkt. 73, at 9. For example, neither the government or the Defendant has any way to ascertain who was a member of the "I'm 10-15" Facebook group, let alone obtain a particular individual's history of posts (or lack thereof) within the group. Nevertheless, three Border Patrol prospective witnesses in this case self-disclosed membership, and in one instance, participation, with the understanding that appropriate safeguards would be placed on these disclosures. Such self-reporting is likely to diminish in the future if agents discover that their disclosures will almost invariably be subject to public access just because admissibility of the information provided was litigated before trial and regardless of a court's ultimate ruling as to admissibility. This practice will also encourage defendants to more aggressively litigate the admissibility of irrelevant past actions of law enforcement witnesses, in an effort to drum up blame-deflecting publicity or public support.

Based on the low weight of the presumptive right of access afforded the Giglio Materials, as well as the countervailing privacy, safety, and judicial efficiency concerns, the government has overcome the common-law presumption of access, which justifies continued sealing. Similarly, the privacy, safety, and judicial efficiency concerns represent "higher values" overcoming the

---

[8] This good-faith production should not be construed as a concession that the disclosed materials are admissible at trial or should otherwise be disclosed publicly. Indeed, as the government made clear in litigating these issues, the opposite is true. If the government's provision of materials for *in camera* review by the Court or disclosure to the defense pursuant to a protective order automatically subjected them to public dissemination—as the Defendant seems to suggest—then it would disincentivize the government to err on the side of disclosure with respect to materials that the government believes do not qualify as *Giglio* but recognizes to be a closer call.

qualified First Amendment right of access and justifying the essential need for sealing. The Second Circuit has recognized that privacy interests, the physical safety of witnesses, and "maintaining the integrity of significant activities entitled to confidentiality"—in this case, the ongoing viability of the Giglio disclosure process—are among the "higher values" that may overcome a First Amendment right of access. *Courthouse News Service*, 131 F.4th at 69. As such, the Giglio Materials should remain under seal.

**5. The Government's Letter Accompanying Dismissal**

Advance makes a specific unsealing request relating to the government's letter accompanying its seeking leave to dismiss the case. Dkt. 85, at 7-8. Advance appears convinced that the letter reveals the government's rationale for dismissal. *Id.* at 7 ("The Letter will presumably illuminate *why* the prosecution sought to dismiss this case five days before trial" (emphasis in original)). However, the letter was sealed because it referred to matters governed by Rule 6(e) and this Court's prior orders, specifically the existence of the "no bill." The remainder of the letter addressed unsealed matters, including the government's efforts to comply with the Court's order on the Defendant's motion to compel. *See* Dkt. 83, Ex. A; Dkt. 73, at 10. Assuming the Court grants the government's request that the existence of the "no bill" should remain under seal, the government has no objection to the letter being publicly docketed, with the letter's fourth paragraph redacted in its entirety. *See* Dkt. 83, Ex. A, at 1-2 (paragraph beginning with "With respect to the Court's show-cause Order").

## IV. CONCLUSION

Advance's motion should be denied insofar as it requests disclosure of the existence of the "no bill;" references to, quotations from, or the entirety of the grand jury transcripts; or the Giglio Materials. As to the "no bill" and the grand jury transcripts, Advance cannot establish that

"particularized need" or "special circumstances" exist justifying unsealing. As to the Giglio Materials, the government has overcome the rebuttable common-law presumption of public access and the qualified First Amendment right of access based on the existence of countervailing interests and "higher values" justifying sealing. The government urges the Court to make specific, detailed findings as to Advance's inability to meet its burden and the justifications for sealing. *See Lugosch*, 435 F.3d at 120. To the extent necessary, those findings should also be entered under seal. *See New York Times*, 828 F.2d at 116.

Should the Court determine unsealing is warranted, the government respectfully requests the Court stay its order pending appeal. *See* Fed. R. App. P. 8(a)(1).

Respectfully submitted on this the 11th day of September, 2026.

TODD BLANCHE
Attorney General

JOHN A. SARCONE III
First Assistant United States Attorney

By: ______________________
Benjamin A. Gillis
Assistant United States Attorney
Bar Roll No. 704915