**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

-v- 5:25-CR-492 (AJB)

MARVIN WOTSBELI AGUILAR-GARCIA,

Defendant.

---

**Hon. Anthony Brindisi, U.S. District Judge:**

# DECISION and ORDER

## I. INTRODUCTION

On December 16, 2025, U.S. Department of Homeland Security Special Agent Jonathan Adamowich swore out a criminal complaint that charged defendant Marvin Wotsbeli Aguilar-Garcia ("defendant") with assaulting a federal officer during an immigration arrest. *See* Dkt. No. 1. Although the United States of America ("the Government") managed to indict defendant on the same charge, Dkt. No. 10, the prosecution was dropped in the lead up to trial, *see* Dkt. No. 83, and defendant was released, Dkt. No. 84. The case was closed on February 12, 2026. *See id*.

On July 29, 2026, proposed-intervenor Advance Publications, Inc. ("Advance"), newspaper publisher of *The Post Standard* and its website, *Syracuse.com*, sought to intervene in this matter to request unsealing of (1) the Government's letter requesting dismissal of the case (at Dkt. Nos. 81, 83); and (2) the pre-trial motions, related documents, and this Court's Order (at Dkt. Nos. 31, 48, 53, 62, 64, 70-72, 77, 80). Dkt. No. 85 ("Advance Letter"). Advance also sought to ensure that (3) certain documents (at Dkt. Nos. 22, 41, 60) were posted on the public docket. *Id.*

On July 30, 2026, the Court ordered briefing from defendant and the Government. Dkt. No. 87. Thereafter, defendant submitted a letter brief stating that he had no objection to the request

to unseal, with the exception of one minor set of redactions. Dkt. No. 90. The Government, for its part, sought an extension of time, Dkt. No. 89, and then opposed in substantial part. Dkt. No. 95 ("Gov't Opp."). There, the Government explained that it did not object to the Court posting the three missing docket entries to the public docket, or to the public filing of a redacted version of the Government's letter seeking leave to dismiss. *Id.* However, the Government objected to unsealing of the currently sealed docket entries. *Id.* at 3. Advance has replied. Dkt. No. 96.

The motion will be considered on the basis of the submissions without oral argument.

## II. BACKGROUND[1]

On December 18, 2025, the Government obtained from a federal grand jury a one-count indictment charging defendant Marvin Wotsbeli Aguilar-Garcia ("defendant") with assaulting a federal officer:

> On or about December 15, 2025, in Lewis County in the Northern District of New York, the defendant **MARVIN WOTSBELI AGUILAR-GARCIA**, knowingly and intentionally did forcibly assault, resist, oppose, impede, and interfere with any person designated in 18 U.S.C. § 1114, that is a Border Patrol Agent, while the agent was engaged in official duties, and inflicted bodily injury, in that **AGUILAR-GARCIA** thew [*sic*] a book at the agent during a traffic stop, striking the agent near the eye and causing injury, in violation of Title 18, United States Code, Section 111(a)(1) & (b).

Dkt. No. 10 (emphases in original). Trial was set for February 17, 2026. Dkt. No. 18.

On January 29, 2026, the Government presented a proposed superseding indictment to the same grand jury. *See* Dkt. No. 48. According to the Government, the proposed superseding indictment was identical to the original indictment in all respects except that it alleged defendant

[1] Certain matters discussed in this opinion were the subject of sealing requests based on a protective order to which defendant consented. *See* Dkt. No. 59. Other matters were the subject of *ex parte* sealing requests governing disclosure of certain grand jury matters, *see* Dkt. No. 42, and potential impeachment information about prospective law enforcement witnesses, *see* Dkt. No. 60. For reasons explained *infra*, these matters are being discussed in this opinion, which has been filed as a publicly available docket entry.

"threw an object at the agent during a traffic stop" rather than alleging that defendant "thew [*sic*] a book at the agent during a traffic stop." *Id*.

The grand jury returned a "no true bill." The no bill was reported to the Court and, with the Court's approval, disclosed to defendant. Out of an abundance of caution, the Government framed its request to disclose this information to defendant as a petition to disclose a "grand jury matter" under Rule 6(e)(3)(E)(i) of the Federal Rules of Criminal Procedure. Consistent with that framing, the Government proposed—and the Court approved—a protective order limiting disclosure. Accordingly, any filings discussing or referencing the fact of the "no true bill," along with any references to the grand jury's consideration of the proposed superseding indictment, have been filed as sealed. *See, e.g.*, Dkt. Nos. 45, 48, 53, 62, 64. Certain of these sealed filings include transcripts of testimony given before the grand jury and filings quoting or discussing that testimony. *See* Dkt. Nos. 53, 62, 64, 80.

On February 7, 2026, ten days before trial, the Government also disclosed to defendant certain material pursuant to *Giglio v. United States*, 405 U.S. 105 (1972). Dkt. No. 70. That material concerned U.S. Border Patrol Agent Trevor Baize—the agent whom defendant was accused of injuring with a book or an object during the December 15, 2025, traffic stop—and, in particular, his membership in the "I'm 10-15" Facebook group and other aspects of his social media history. *See id.*[2] According to the Government's disclosure, Agent Baize joined the group in approximately 2018 and remained a member until the group closed in 2019. *Id.*

[2] The "I'm 10-15" Facebook group was a private Facebook group created in 2016 for current and former U.S. Border Patrol agents. According to reporting by ProPublica, the group had approximately 9,500 members nationwide and described itself as a forum for both "funny" and "serious" discussion concerning Border Patrol work; the name "10-15" refers to a Border Patrol code for "aliens in custody." ProPublica reported that posts within the group included derogatory comments about migrants and members of Congress, as well as jokes and memes concerning migrant deaths. *See generally* A.C. Thompson, *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, PROPUBLICA (July 1, 2019), https://www.propublica.org/article/secret-border-patrol-facebook-group-agents-joke-about-migrant-deaths-post-sexist-memes.

During that period, Agent Baize reported that he had re-shared posts or stories created by other users on twelve or fewer occasions and added his own commentary concerning law enforcement use-of-force policies and his views concerning the appropriate use of force. Dkt. No. 70. Agent Baize also disclosed that he re-shared approximately twenty other posts or memes in the group without adding commentary. *See id*. According to Agent Baize, those posts generally expressed support for Border Patrol or immigration enforcement. *Id.* Agent Baize further stated that he could not rule out the possibility that he had re-shared a post or meme employing a derogatory term for migrants, although he did not believe that he had done so. *Id.*

The Government's February 7 disclosure also identified several posts from Agent Baize's personal Facebook account. *See* Dkt. No. 70. In December 2023, Agent Baize shared an image of a T-shirt stating, "Wanna make everything electric? Start with the border wall." *Id.* In January 2026, he re-shared a post concerning the shooting of Alex Pretti in Minneapolis and, in an exchange with another Facebook user, expressed the view that Pretti had "fought" and "violently resisted" law enforcement while armed, and that Pretti's own actions had caused his death. *Id.*

The Government's February 7 disclosure also included information concerning the membership of U.S. Border Patrol Agent Jordan Bastedo—who participated in the pursuit of defendant following the traffic stop and later observed Agent Baize's alleged injury—and Supervisory Border Patrol Agent Kajoya Daniels, another prospective Government witness, in the "I'm 10-15" group. *See* Dkt. No. 70. Agent Bastedo reported that he joined the group in approximately 2016 but never posted or otherwise participated in it. *Id.* According to Agent Bastedo, he left the group in approximately September 2018 because he believed the "tenor" of the posts and comments was becoming "inappropriate." *Id.*

Agent Daniels similarly reported that he had been a member of the group. Dkt. No. 70. Agent Daniels did not recall whether he had posted or otherwise participated in the group, but stated that his usual practice was not to comment, post, or otherwise engage on social media, and that he did not believe he departed from that practice while a member. *Id.* Agent Daniels further reported that, in 2019, he encountered a post containing derogatory references to Congresswoman Alexandria Ocasio-Cortez, commented that the post should be removed and that the participants should act more professionally, and thereafter left the group. *Id.*

After disclosing this *Giglio* material to the defense, the Government moved *in limine* to preclude defendant from introducing the foregoing social media materials at trial. Dkt. No. 70. Defendant opposed. Dkt. No. 71. That briefing, including the social media materials attached to the Government's motion, was filed under seal (pursuant to a protective order) on February 11, 2026. Dkt. Nos. 70, 71. The Court ordered supplemental briefing, Dkt. No. 72, but the indictment was dismissed on the Government's motion the next day. Dkt. No. 83.

## III. DISCUSSION

Advance has requested unsealing of (1) the Government's letter requesting dismissal of the case (at Dkt. Nos. 81, 83); and (2) the pre-trial motions, related documents, and this Court's Order (at Dkt. Nos. 31, 48, 53, 62, 64, 70-72, 77, 80). Dkt. No. 85. Advance has also sought to ensure that (3) certain documents (at Dkt. Nos. 22, 41, 60) were posted on the public docket. *Id.*

At the outset, the Government acknowledges that Advance, as a media organization, has standing to intervene in this criminal matter to enforce the public's right of access. *See* Gov't Opp. at 7 (citing *United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008); *United States v. Adams*, 2025 WL 1226635, at *2 n.1 (S.D.N.Y. April 25, 2025)). The Court agrees. Accordingly, Advance will be designated as an intervenor for that purpose.

On the merits, the Government agrees that certain missing docket entries should be publicly reflected on the docket, and that a redacted version of its letter seeking dismissal may be filed publicly. *See* Gov't Opp. But the Government otherwise opposes unsealing. *See id.*

**A. Intervenor's Unsealing Request**

As a threshold matter, the Government contends that Advance should not be permitted access to the sealed materials in question *before* the Court has ruled on the motion to unseal. Gov. Opp. At 7. In the Government's view, permitting Advance to access these materials prior to unsealing runs the risk of undermining the interests that the Government seeks to protect. *Id.* at 7–8. For instance, the Government points out that the protective orders governing disclosure of certain materials bound the parties but did not expressly restrict an intervenor's ability to disseminate them. *Id.* Thus, according to the Government, while Advance is entitled to intervene and litigate its request for access, it is not entitled to obtain an unrestricted "first look" at the sealed materials *before* the Court determines whether they should remain partially or completely sealed. *Id.* at 8.

After considering the matter, the Court agrees with the Government: Advance is not entitled to a "first look" at the sealed materials. But under these circumstances, the Government's objection is procedural rather than substantive. The Court has reviewed the materials and determined, for the reasons set forth below, which portions may be disclosed and which must remain sealed or redacted.

**1. *Giglio* Materials**

First, as to the *Giglio* materials, the Government argues that continued sealing is warranted by the agents' privacy interests and by concern that public disclosure could chill future self-reporting of potentially impeaching information by law enforcement witnesses. Gov't Opp. at 28–36.

Neither concern is insubstantial. But the Government has not justified continued comprehensive sealing of the *Giglio* materials in question. Courts "recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). This common law right of public access, which "is said to predate the Constitution," *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) ("*Amodeo I*"), derives from the public's interest in "keep[ing] a watchful eye on the workings of public agencies" and in monitoring the operation of the courts. *Nixon*, 435 U.S. at 598; *see also United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) ("*Amodeo II*").

The common law analysis proceeds in several steps. First, the Court must determine whether the material at issue constitutes a "judicial document." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). A document qualifies as a judicial document where it is "relevant to the performance of the judicial function and useful in the judicial process." *Amodeo I*, 44 F.3d at 145. Put differently, a filing is a judicial document where it "would reasonably have the tendency to influence a district court's ruling on a motion or in the exercise of its supervisory powers," regardless of whether the document ultimately affected the Court's decision. *Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019) (internal quotation marks omitted).

Distinct from the common law right of access is a First Amendment right of public access to criminal proceedings. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980). The Second Circuit has recognized two related approaches for determining whether that right attaches. Under the "experience and logic" approach, courts ask whether the type of proceeding or document at issue has historically been open to the press and general public and whether public access "plays a significant positive role in the functioning of the particular process in question." *Hartford Courant Co. v. Pelligrino*, 380 F.3d 83, 92 (2d Cir. 2004) (quoting *Press-Enterprise Co.*

*v. Superior Court*, 478 U.S. 1, 8 (1986)). Alternatively, a First Amendment right may attach where access to the document is "derived from or [is] a necessary corollary of the capacity to attend the relevant proceedings." *Newsday LLC v. Cnty. of Nassau*, 730 F.3d 156, 164 (2d Cir. 2013) (internal quotation marks omitted).

The Government does not dispute that Docket Numbers 70 and 71 are "judicial documents." Those filings asked the Court to decide whether defendant could use the disclosed "I'm 10-15" Facebook group and other social media evidence to impeach certain Government witnesses at trial. A common law presumption of access therefore attaches to this material. *See Lugosch*, 435 F.3d at 119. So does a First Amendment right of qualified access. *See United States v. Silver*, No. 2016 WL 1572993, at *4 (S.D.N.Y. April 14, 2016) (reasoning that the First Amendment right of access applies to motion *in limine* practice, which has "historically been open to the press and general public") (quoting *Lugosch*, 435 F.3d at 120).

For documents that qualify as judicial in nature, the next step is to determine the weight of the common law presumption of access. *See Lugosch*, 435 F.3d at 119. "The weight of the presumption is a function of (1) 'the role of the material at issue in the exercise of Article III judicial power' and (2) 'the resultant value of such information to those monitoring the federal courts.'" *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 142 (2d Cir. 2016) (quoting *Lugosch*, 435 F.3d at 119–20); *see also Amodeo II*, 71 F.3d at 1049. Materials that "directly affect an adjudication" and play a substantial role in determining litigants' substantive rights receive a strong presumption of access, whereas materials having only a limited or ancillary role in the exercise of judicial power receive a weaker presumption. *Amodeo II*, 71 F.3d at 1049–50; *see also Brown*, 929 F.3d at 50.

As to the common law access balancing, a presumption of public access applies to the motion *in limine* and related filings. The strength of the presumption "derive[s] from the role those documents played in determining litigants' substantive rights—conduct at the heart of Article III—and from the need for public monitoring of that conduct." *Amodeo II*, 71 F.3d at 1049. When "documents are usually filed with the court and are generally available, the weight of the presumption is stronger than [when] filing with the court is unusual or is generally under seal." *Id.* at 1050.

Although motions *in limine* enjoy a lighter presumption than material introduced at trial or dispositive motions, *see Brown*, 929 F.3d at 50, the filings here called directly upon the Court to determine whether the defense could impeach certain Government witnesses with evidence bearing on potential bias and credibility. And because no evidentiary hearing was held, the motion papers themselves constituted the sole means by which the Court was asked to exercise that authority.

Here, the public has a legitimate interest in "knowing the grounds on which government conduct in obtaining evidence is challenged[.]" *In re N.Y. Times Co.*, 828 F.2d 110, 114 (2d Cir. 1987) (internal citations omitted). That interest is particularly substantial where, as here, the evidentiary dispute was presented entirely through written submissions. *See In re Pub. Def. Serv. for D.C.*, 607 F. Supp. 3d 11, 23 (D.D.C. 2022) (stating the public's interest in documents related to a motion to suppress is especially high, because a suppression hearing "resembles a bench trial" and "the conduct of law enforcement officers is at issue"); *Silver*, 2016 WL 1572993, at *5 ("Because motions *in limine*, which are usually publicly available, have an important role in determining litigants' rights to a fair trial and because the public has a legitimate interest in monitoring a court's power to decide evidentiary questions, a strong presumption of access applies to the Motion in Limine and related documents.").

And, as relevant here, "[t]he press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 839 (1978) (internal quotation marks and citation omitted). Accordingly, the common law presumption of access carries meaningful heft. *See United States v. Wecht*, 484 F.3d 194, 210 (3d Cir. 2007) (affirming unsealing of FBI agent's personnel records and related *Brady*/*Giglio* filings because "the process by which the government investigates and prosecutes its citizens is an important matter of public concern").

Against that backdrop, the Government principally invokes the privacy interests of the individual agents identified in the materials and the institutional interest in encouraging law enforcement witnesses to continue self-reporting information that may bear on their credibility. Gov't Opp. at 28–36. While those interests are legitimate, they do not justify wholesale sealing of the filings on the present record.

As to the question of privacy, the Second Circuit has instructed courts to "consider the degree to which the subject matter is traditionally considered private rather than public . . . [f]inancial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public." *Amodeo II*, 71 F.3d at 1051. "The nature and degree of injury must also be weighed." *Id.* In addition, courts must consider "the sensitivity of the information and the subject," "the reliability of the information," and whether "there is a fair opportunity for the subject to respond to any accusations contained therein." *Id.*

A review of the materials at issue in light of these privacy considerations confirms that the subject matter does not involve merely "private" matters or "embarrassing conduct." The "I'm

10-15" group drew national scrutiny because posts attributed to its members included racist and misogynistic material, derogatory commentary about migrants, and jokes concerning migrant deaths. *See United States v. Ramirez-Chavez*, 2026 WL 1759521, at *2 (D.N.M. June 18, 2026). Conduct or speech by law enforcement officers reflecting potential bias have obvious public ramifications where those officers exercise governmental authority and appear as witnesses in criminal prosecutions.

Thus, although the Court does not equate membership in the group with endorsement of its content, the subject matter of the disclosures falls materially closer to the "conduct affecting a substantial portion of the public" side of the balance than to the purely private matters ordinarily entitled to greater privacy protection. *See Fenico v. City of Philadelphia*, 70 F.4th 151, 153 (3d Cir. 2023) (recognizing in the First Amendment context that officers' social media posts celebrating police violence could render their credibility suspect in criminal proceedings and undermine public confidence in policing).

That said, the Government is correct that the privacy interests are not identical as to each agent. According to the Government's account, Agents Bastedo and Daniels did not engage in the conduct that gave rise to the group's notoriety—Bastedo reported that he never posted in the group and left when its tenor became inappropriate; Daniels reported that he objected to an offensive post and thereafter departed. Gov't Opp. at 30; Dkt. No. 70. Their membership therefore cannot fairly be treated as any evidence that they adopted the views expressed by other members.

But this argument carries less force as to Agent Baize. The Government acknowledges that Baize's active participation in "I'm 10-15," as well as personal social media posts that allegedly bear on his views concerning immigrants as a group, more closely resemble "conduct

affecting a substantial portion of the public" than traditionally private matters. Gov't Opp. at 32 (citing *Amodeo II*, 71 F.3d at 1051).

The Court agrees. These materials do not concern "[f]inancial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications," or the like. *Amodeo II*, 71 F.3d at 1051. Rather, they concern conduct potentially bearing on the credibility of a law enforcement witness in a criminal prosecution involving immigration enforcement.

This logic also applies to Agent's Baize's personal Facebook activity. Though the fact that the posts appeared on a personal social media account weighs to some degree in favor of privacy, the subject matter is not analogous to traditionally private information. *See Amodeo II*, 71 F.3d at 1051. Rather, to the extent the posts bear on Baize's attitudes toward migrants or the use of force, they, too, have public ramifications.

Nor does the Government's concern about chilling future self-reporting warrant sealing the filings in their entirety. The Government argues that disclosure could discourage agents from voluntarily identifying potentially impeaching information in future cases. Gov't Opp. at 33–36. The Government has not shown, however, that disclosure of these particular judicial documents would create a sufficiently concrete risk to outweigh the presumption of access that attaches to these materials. Were such a generalized concern sufficient, materials concerning potential *Giglio* information could remain sealed in virtually every case in which the Government represented that disclosure might affect future reporting.

The same conclusion about these materials follows under the First Amendment analysis. Where, as here, the First Amendment right of access applies, sealing is permitted only if "specific, on the record findings are made demonstrating that closure is essential to preserve higher values

and is narrowly tailored to serve that interest." *Lugosch*, 435 F.3d at 120 (quoting *In re N.Y. Times Co.*, 828 F.2d at 116). Generalized concerns are insufficient. *Id.*

The Government's interests in protecting legitimate privacy concerns and preserving candor in internal disclosure processes may, in an appropriate case, qualify as such higher values. But those interests do not support withholding from public view the entirety of filings submitted for resolution of an evidentiary dispute. Instead, the Court must identify the interests that would be harmed by disclosure and consider whether redaction or another less restrictive alternative would adequately protect those interests. *See In re New York Times Co.*, 828 F.2d at 116.

In other words, not every piece of information contained in the *Giglio* filings must be disclosed without limitation. The Government invokes safety concerns, citing recent incidents of threats, "doxxing," and harassment directed at federal immigration officers. Gov't Opp. at 32–34. Again, those concerns are serious, but the Government has not identified a particularized threat arising from disclosure of these filings that would justify wholesale sealing.

Thus, to the extent the filings contain personal identifying information unrelated to the agents' identities, or collateral information identifying private third parties, targeted redaction provides a less restrictive means of protecting that interest. *See Fowler-Washington v. City of New York*, 2020 WL 5893817, at *3–4 (E.D.N.Y. Oct. 5, 2020) (distinguishing relevant police misconduct records from officers' "social security numbers, pension information, spousal identifying information, religious affiliations, home addresses, phone numbers, and photos," which warranted protection from disclosure); *United States v. Lopez*, 2022 WL 4134423, at *1–2 (E.D.N.Y. Sept. 12, 2022) (granting in part journalist's motion to unseal filing concerning *Giglio* material related to Government witnesses while requiring targeted redactions of sensitive information).

However, the Government has not demonstrated a sufficient privacy interest in the agents' identities themselves to warrant complete redaction. Each of the three agents has already been identified by name in public filings in this action. *See, e.g.*, Dkt. Nos. 20, 21, 26 at 8 n.5; *see also* M. Breidenbach, *Assault with an owner's manual: How a botched immigration bust in NY reveals agents' tactics*, SYRACUSE.COM (May 12, 2026), https://www.syracuse.com/news/2026/05/assault-with-an-owners-manual-how-a-botched-immigration-bust-in-ny-reveals-agents-tactics.html (discussing BPA Baize's "I'm 10-15" membership).

Moreover, other courts have publicly identified officers by name under similar circumstances, notwithstanding the fact that the underlying *Giglio* materials remained sealed or subject to *in camera* review. *Cf. United States v. Rios-Diaz*, 2021 WL 978758, at *1–5 (S.D. Cal. Mar. 16, 2021) (publicly identifying a Border Patrol agent whose membership in "I'm 10-15" had been disclosed after the Government submitted a sealed *ex parte* application concerning potential officer misconduct, while noting that portions of the Government's submission remained under seal); *United States v. Bernal-Sanchez*, 2023 WL 7179469, at *1 (9th Cir. Nov. 1, 2023) (publicly identifying another Border Patrol agent while remanding for *in camera* review of his "I'm 10-15" materials).

In sum, the Government has not carried its burden of showing that wholesale sealing is warranted under either the common law or First Amendment framework. Accordingly, Docket Numbers 70 and 71 will be unsealed subject to certain narrowly tailored redactions, which will be explained *infra*.

**2. Grand Jury Materials**

Second, the Government argues that the materials revealing the existence of the grand jury's return of the "no bill," as well as the grand jury transcripts and any of the parties' filings

quoting or discussing those transcripts, must remain sealed under Federal Rule of Criminal Procedure 6(e). Gov't Opp. at 15–28.

Federal grand juries operate in secret. *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959). To that end, Rule 6(e) "embodies a long established policy of the federal courts to maintain the secrecy of grand jury proceedings." *United States v. Interstate Dress Carriers, Inc.*, 280 F.2d 52, 54 (2d Cir. 1960). That secrecy extends not only to testimony given before the grand jury, but also to documents and information that would reveal "what is said or what takes place in the grand jury room." *Id.*; *see also In re Grand Jury Subpoena*, 103 F.3d 234, 238 (2d Cir. 1996) (explaining that Rule 6(e) protects information that would reveal the "nature [or] direction of the grand jury proceedings").

Where Rule 6(e) applies, the common law right of access does not independently authorize disclosure. *See Application of Newsday, Inc.*, 895 F.2d 74, 79 (2d Cir. 1990); *In re Grand Jury Subpoenas Dated March 2, 2015*, 2016 WL 6126392, at *3 (S.D.N.Y. Oct. 19, 2016). The First Amendment likewise does not supply a general right of access to grand jury proceedings or materials. *See Press-Enterprise Co.*, 478 U.S. at 8–9; *In re Newsday*, 895 F.2d at 79. Instead, disclosure is governed principally by the limited exceptions set forth in Rule 6(e)(3), together with the narrow "special circumstances" doctrine recognized by the Second Circuit in *In re Petition of Craig*, 131 F.3d 99 (2d Cir. 1997) ("*Craig*").

As a threshold matter, the Government contends that the fact that the grand jury declined to return the proposed superseding indictment is itself a "matter occurring before the grand jury" within the meaning of Rule 6(e). Gov't Opp. at 15–17. According to the Government, a no bill is the direct product of the grand jury's deliberative process and necessarily reveals the result of those

deliberations. *Id.* The Government therefore maintains that the ordinary common law presumption of access does not authorize disclosure of that information and that Rule 6(e) governs. *Id.*

Rule 6(e)'s shroud covers a broad range of "grand jury matters." Rule 6(e)(2)(B) bars the disclosure of "a matter occurring before the grand jury" by the grand jurors, interpreters, court reporters, government attorneys, and others who would be involved in the proceedings. Fed. R. Crim. P. 6(e)(2)(B). "Rule 6(e)(6) provides that all records, orders, and subpoenas *relating to* grand jury proceedings be sealed, not only actual grand jury materials; similarly, Rule 6(e)(5) refers to matters *affecting* a grand jury proceeding, not only the proceedings themselves." *In re Grand Jury Subpoena*, 103 F.3d at 237 (emphases in original).

But this conclusion does not end the inquiry. For instance, Rule 6(e)(3) lists out several exceptions to the secrecy rule. Fed. R. Crim. P. 6(e)(3). Beyond those enumerated exceptions, the Second Circuit has recognized that district courts retain limited inherent authority to disclose grand-jury materials where "special circumstances" justify departure from the ordinary rule of secrecy. *Craig*, 131 F.3d at 102–03.

In determining whether special circumstances warrant disclosure, courts may consider, among other things:

> (i) the identity of the party seeking disclosure; (ii) whether the defendant to the grand jury proceeding or the government opposes disclosure; (iii) why disclosure is being sought; (iv) what specific information is sought; (v) how long ago the grand jury proceedings occurred; (vi) the current status of the principals and their families; (vii) the extent to which the desired material has previously been made public; (viii) whether witnesses who might be affected remain alive; and (ix) the additional need for maintaining secrecy in the particular case.

*Id.* at 106 (cleaned up).

To be sure, this disclosure authority is narrow. After all, *Craig* cautions district courts that Rule 6(e) continues to govern "'garden variety' petitions for grand jury disclosure" and that the "baseline presumption" remains against disclosure. *Craig*, 131 F.3d at 103–04. But *Craig* also

makes clear that, in appropriate cases, "historical or public interest alone could justify the release of grand jury information." *Id.* at 105.

The question is whether the unusual circumstances presented here justify limited disclosure of the fact that the same grand jury that returned the original indictment later returned a "no true bill." That turns out to be a question without any directly governing precedent, at least as far as the Court can tell. Reasoning by analogy, there are two provisions of Rule 6 that touch on issues related to a "no true bill."

First, Rule 6(f) requires a grand jury's refusal to indict to be promptly reported to the magistrate judge when a complaint or information is pending against the defendant. But that provision does not squarely govern this case because defendant had already been indicted. Second, Rule 6(c) requires the foreperson to record the number of jurors concurring in an indictment and provides that the tally may not be made public absent court order. But that provision protects the secrecy of the grand jury's voting record, not merely its ultimate disposition.

After careful consideration in light of the governing law, the Court concludes that limited unsealing is warranted: the *fact* of the grand jury's return of the "no true bill" should not be a secret. This limited unsealing is based on the Court's conclusion that continued sealing of the fact of the "no true bill" is no longer warranted under the circumstances presented here.

The grand jury's deliberations and any other matters that led to that original result, such as the transcripts and the tally sheet, must remain sealed under Rule 6. But defendant had already been indicted on the same exact charge. The return of the original indictment is a public record. Dkt. No. 10. The grand jury's subsequent return of a 'no true bill' may likewise be disclosed without revealing the substance of the grand jury's proceedings.

To be sure, the policies underlying grand jury secrecy do not dissipate after the particular grand jury has completed its work. *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 222, (1979). Among other things, secrecy protects witnesses from retaliation or stigma, encourages future witnesses to testify freely, protects the independence of grand jury deliberations, and shields those who are investigated but not ultimately charged. *See id.* at 219 n.10, 222; *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681 n.6 (1958). That said, if the grand jury investigation has concluded, "then most of the policies underlying the need for secrecy are no longer present. Generally, the only reason that survives the conclusion of an investigation is the encouragement of disclosures by those with knowledge of crime." *United States v. Moten*, 582 F.2d 654, 663 (2d Cir. 1978).

Here, defendant has been deported, Dkt. No. 90 at 4; the prosecution has ended; the grand jury has concluded its deliberations on the proposed superseding instrument; and there is no risk of witness tampering. *Craig*, 131 F.3d at 102. In short, unsealing the fact of the grand jury's return of the "no true bill" would not jeopardize the secrecy of the grand jury process.

Finally, the unsealing request is made by Advance, a news organization seeking to report on a completed federal prosecution. Advance does not seek disclosure for use in collateral litigation or for a purely private purpose. Rather, it seeks information bearing on the course of a prosecution which ended without trial after the Government unsuccessfully sought a superseding indictment. Defendant's counsel, too, supports Advance's request. *See* Dkt. No. 90.

The public record already reflects the original charge against defendant and the Government's ultimate dismissal of the prosecution. What it does not presently disclose is the intervening fact that the Government sought a superseding indictment broadening the alleged instrumentality of the assault from a "book" to an "object," and that the grand jury declined to return that

superseding indictment. The existence of the no bill therefore provides the necessary context for understanding the course and outcome of a criminal case that has otherwise unfolded publicly. *See, e.g.*, N.D. Ill. L. Crim. R. 6.2.1 (requiring written report where twelve grand jurors fail to concur in an indictment and directing filing of the report on the docket).

To be clear, the remainder of the grand jury's work—including everything else related to the proceeding—must remain sealed for all of the thoughtful reasons that have been repeatedly articulated in our case law. *Kaley v. United States*, 571 U.S. 320, 329 (2014) ("The grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime."). Although the circumstances of this case are sufficiently unusual to warrant disclosure of the fact that the grand jury declined to return the proposed superseding indictment, they do not justify disclosure of the grand jury transcripts themselves.

This is because, unlike disclosure of the result alone, release of the transcripts would expose the very matters—what was said and what occurred before the grand jury—that Rule 6(e) most directly protects. *See Laws.' Comm. for 9/11 Inquiry, Inc. v. Garland*, 43 F.4th 276, 285–87 (2d Cir. 2022) (reaffirming Rule 6(e)'s general rule of grand jury secrecy); *United States v. Maxwell*, 794 F. Supp. 3d 215, 221–31 (S.D.N.Y. 2025) (declining to unseal grand jury transcripts and exhibits under Rule 6(e) and *Craig*).

Although the grand jury is typically viewed as "an accusatory body under the (almost) complete control of the prosecutor," *In re Grand Jury Proceedings*, 219 F.3d 175, 189 (2d Cir. 2000), it "belongs to no branch of the institutional Government," and serves as a "kind of buffer or referee between the Government and the people," *United States v. Williams*, 504 U.S. 36, 47 (1992). Most of its work is secret, and rightly so. But the public interest in transparency is best served by a limited disclosure of its return in this case: the fact of a "no true bill."

### B. Intervenor's Request as to the Missing Docket Entries

Finally, Advance asks the Court to ensure that Docket Numbers 22, 41, and 60 are reflected on the public docket. Advance Letter at 10–12. The Government does not oppose that request and acknowledges that the absence of public docket entries for those filings was inadvertent. Gov't Opp. at 8–9. Accordingly, Advance's request will be granted.

## IV. CONCLUSION

Therefore, it is

ORDERED that

1. Intervenor Advance Publications, Inc.'s Letter Motion, Dkt. No. 85, is **GRANTED IN PART** and **DENIED IN PART** consistent with this Decision and Order;

2. Docket Numbers 70 and 71 shall be unsealed subject to narrowly tailored redactions necessary to protect personal identifying information;

3. Within fourteen (14) days of the date of this Decision and Order, the Government and defendant shall confer and jointly submit proposed redacted versions of Docket Numbers 31, 48, 53, 62, 64, 70-72, 77, 80, 81, and 83 for public filing. If the parties contend that any portion of those filings should remain sealed, they shall identify the specific material at issue and the basis for continued sealing. The grand jury transcripts themselves, as well as any portions of the filings that describe the substance of the grand jury's deliberations, must remain under seal or appropriately redacted. In addition, permissible redactions may include personal identifying information and collateral identifying information concerning private third parties who are unrelated to this litigation;

4. Within fourteen (14) days of the date of this Decision and Order, the Government and defendant shall submit proposed redacted versions of any filings that reference the no bill but

also contain grand jury material that remains protected by Rule 6(e), together with a proposal identifying which docket entries (if any) may be unsealed in whole and which require redaction;

5. The Clerk of the Court shall create public docket entries reflecting the existence of Docket Numbers 22, 41, and 60 and indicating that the corresponding documents were filed under seal; and

6. The Government shall submit a proposed redacted version of its letter accompanying its request for dismissal (Dkt. No. 83) within fourteen (14) days.

The Clerk of the Court is directed to terminate the pending letter motion.

**IT IS SO ORDERED.**

Dated: October 8, 2026
Utica, New York.

Anthony J. Brindisi
U.S. District Judge